**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**Nos. 22-1045, 22-1103, 22-1104, 22-1105,
22-1110, 22-1257, and 22-1258
(Consolidated)**

---

**Liquid Energy Pipeline Association, *et al.*,**
***Petitioners,***
**v.**
**Federal Energy Regulatory Commission and
United States of America,**
***Respondents.***

---

**ON PETITION FOR REVIEW OF ORDERS OF
THE FEDERAL ENERGY REGULATORY COMMISSION**

---

**OPENING BRIEF OF SHIPPER PETITIONERS**

Richard E. Powers, Jr.
Matthew D. Field
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4360
REPowers@venable.com
MField@venable.com

*Counsel for Airlines for America and
National Propane Gas Association*

Steven A. Adducci
Gregory S. Wagner
William G. Bolgiano
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4361
SAAdducci@venable.com
GSWagner@venable.com
WGBolgiano@venable.com

*Counsel for Chevron Products
Company, a division of Chevron
U.S.A. Inc. and Valero Marketing and
Supply Company*

January 11, 2023
July 6, 2023 (Final Brief)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**Nos. 22-1045, 22-1103, 22-1104, 22-1105,
22-1110, 22-1257, and 22-1258
(Consolidated)**

---

**Liquid Energy Pipeline Association, *et al.*,**
***Petitioners,***
**v.**
**Federal Energy Regulatory Commission and
United States of America,**
***Respondents.***

---

## ON PETITION FOR REVIEW OF ORDERS OF
## THE FEDERAL ENERGY REGULATORY COMMISSION

---

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to the Court's order dated June 13, 2022 and Circuit Rules 26.1 and 28(a)(1) and Rule 28(a) of the Federal Rules of Appellate Procedure, Air Transport Association of America, Inc., d/b/a Airlines for America, Chevron Products Company, a division of Chevron U.S.A. Inc., National Propane Gas Association, and Valero Marketing and Supply Company (together "Shipper Petitioners") hereby file their certificates as to parties, rulings and related cases in the captioned proceedings for review of orders issued by the Federal Energy Regulatory Commission ("Commission" or "FERC").

ii

1.    **Parties and Amici**

1.1    <u>The following participants appeared before FERC in Docket No.</u> <u>RM20-14-001 and RM20-14-002</u>:

Air Transport Association of America, Inc., d/b/a Airlines for America

Apache Corporation

Association of Oil Pipe Lines

Buckeye Partners, L.P.

Canadian Association of Petroleum Producers

Cenovus Energy Marketing Services Ltd.

Chevron Products Company, a division of Chevron U.S.A. Inc.

Colonial Pipeline Company

ConocoPhillips Company

Devon Gas Services, L.P.

Energy Transfer LP

Energy Infrastructure Council

Enterprise Products Partners L.P.

Equinor Marketing & Trading US Inc.

Fieldwood Energy LLC

Kinder Morgan, Inc.

Marathon Oil Company

Murphy Exploration and Production Company-USA

National Propane Gas Association

Ovintiv Marketing Inc.

Pioneer Natural Resources USA, Inc.

Pipeline and Hazardous Materials Safety Administration

Pipeline Safety Trust

Plains All American Pipeline, L.P.

Valero Marketing and Supply Company

1.2   The following are parties, intervenors, and *amici* before the Court in

this proceeding:

Shipper Petitioners:

Air Transport Association of America, Inc., d/b/a Airlines for America

Chevron Products Company, a division of Chevron U.S.A. Inc.

National Propane Gas Association

Valero Marketing and Supply Company

Carrier Petitioners:

Buckeye Partners, L.P.

Colonial Pipeline Company

Energy Transfer, L.P.

Enterprise Products Partners, L.P.

Liquid Energy Pipeline Association (formerly Association of Oil Pipe

Lines)

Plains All American Pipeline, L.P.

Respondents:

Federal Energy Regulatory Commission

iv

United States of America

Intervenors:

      Air Transport Association of America, Inc., d/b/a Airlines for America

      Liquid Energy Pipeline Associations (formerly Association of Oil Pipe

      Lines)

      Canadian Association of Petroleum Producers

      Cenovus Energy Marketing Services Ltd.

      Chevron Products Company, a division of Chevron U.S.A. Inc.

      ConocoPhillips Company

      Enbridge Inc.

      Energy Infrastructure Council

      Marathon Oil Company

      National Propane Gas Association

      Ovintiv Marketing Inc.

      Pioneer Natural Resources USA, Inc.

      Valero Marketing and Supply Company

1.3   <u>The following entities are parent companies and/or hold, directly or indirectly, a 10 percent or greater ownership interest in the Shipper Petitioners:</u>

**Air Transport Association of America, Inc., d/b/a Airlines for America's ("A4A")** members are Alaska Airlines, Inc., American Airlines, Inc., Atlas Air, Inc., Delta Air Lines, Inc., Federal Express Corporation, Hawaiian Airlines, Inc., JetBlue

Airways Corp., Southwest Airlines Co., United Airlines, Inc., and United Parcel Service Co., and associate member Air Canada. A4A is a District of Columbia corporation with its principal place of business in the District of Columbia. A4A has no parent corporation, does not issue stock, and no publicly held company controls more than 10% of A4A. A4A's member companies ship substantial volumes of petroleum products on the nation's interstate pipelines whose rates for transportation are subject to and directly affected by the challenged FERC orders. A4A was a party to the FERC proceedings below and filed comments on behalf of the airline industry, which were considered by FERC in rendering its decision. The fundamental purpose of A4A is to foster a business and regulatory environment that ensures safe and secure air transportation and enables U.S. airlines to flourish, stimulating economic growth locally, nationally, and internationally.

**Chevron Products Company** manages business and assets relating to refining, marketing, trading, supply and distribution of crude oil and products derived from petroleum, and the marketing of related technology in the United States, including transportation of crude oil and refined petroleum products that are shipped over common carrier oil pipelines whose rates for transportation are regulated by FERC and subject to the challenged orders under review. Chevron Products Company is a division of Chevron U.S.A. Inc. Chevron U.S.A. Inc. is an indirect wholly-owned subsidiary of Chevron Corporation, a publicly-traded

corporation that is organized under the laws of Delaware with its principal place of business and corporate offices located in San Ramon, California.

**National Propane Gas Association ("NPGA")** is an incorporated, non-profit trade association that represents the interests of the propane industry before the U.S. Congress, regulatory agencies, and courts. NPGA's membership includes small businesses and large corporations engaged in the retail marketing of propane gas and appliances; producers and wholesalers of propane equipment; manufacturers and distributors of propane gas appliances and equipment; fabricators of propane gas cylinders and tanks; and propane transporters. NPGA has a membership of about 2,500 companies in all 50 states, 36 affiliated state or regional associations, and members in 19 foreign countries. NPGA represents every segment of the propane industry. NPGA members ship substantial volumes of propane on the nation's interstate pipelines whose rates for transportation are subject to and directly affected by the challenged FERC orders. NPGA has no parent companies, is not publicly traded, and no publicly held company owns a ten percent or greater interest in NPGA.

**Valero Marketing and Supply Company ("VMSC")** is engaged in the purchase, marketing, and transportation of various hydrocarbon products, including but not limited to petroleum products and crude oil. VMSC is a substantial shipper of crude oil and petroleum products on the common carrier pipeline facilities whose

rates for transportation are regulated by the FERC and subject to the challenged orders on review.  VMSC is a wholly-owned, indirect subsidiary of Valero Energy Corporation ("Valero") which is a publicly traded holding company whose shares are traded on the New York Stock Exchange.  Valero, through its subsidiaries and affiliates, is primarily engaged in manufacturing and marketing of petroleum-based and low-carbon liquid transportation fuels and petrochemical products in the United States and abroad.  Valero is the only publicly-traded company that owns a 10 percent or greater interest in VMSC.

**2.    Rulings Under Review**

Shipper Petitioners seek review of the following FERC orders:

1.    *Five-Year Review of the Oil Pipeline Index*, Order on Rehearing, Docket No. RM20-14-001, 178 FERC ¶ 61,023 (Jan. 20, 2022), published 87 Fed. Reg. 4476 (Jan. 28, 2022) ("January 2022 Rehearing Order").

2.    *Five-Year Review of the Oil Pipeline Index*, Order on Rehearing, Docket No. RM20-14-002, 179 FERC ¶ 61,100 (May 6, 2022) ("May 2022 Rehearing Order").

**3.    Related Cases**

On February 18, 2022, a petition for review of the January 2022 Rehearing Order was filed at the U.S. Court of Appeals for the Fifth Circuit by Buckeye Partners, L.P., Energy Transfer, L.P., Enterprise Products Partners, L.P. and Plains All American Pipeline, L.P.  *See* Petition for Review, *Buckeye Partners, L.P. v. FERC*, Case No. 22-60100 (5th Cir. Feb. 18, 2022).

On March 3, 2022, an additional petition for review of the January 2022 Rehearing Order was filed at the Fifth Circuit by Colonial Pipeline Company. *See* Colonial Pipeline Company Petition for Review and Request for Consolidation with Case No. 22-60100, *Buckeye Partners, L.P. v. FERC*, No. 22-60100 (5th Cir. Mar. 3, 2022). This petition was consolidated the same day. *See* Order Updating Case Caption, *Buckeye Partners, L.P. v. FERC*, No. 22-60100 (5th Cir. Mar. 3, 2022).

On March 15, 2022 and March 18, 2022, interventions in this consolidated docket were filed by A4A, National Propane Gas Association, Chevron Products Company, Valero Marketing and Supply Company, Pioneer Natural Resources Company USA, Apache Corporation, Ovintiv Marketing, Incorporated, Devon Gas Services, L.P., Murphy Exploration & Production Company-USA, Marathon Oil Company, Cenovus Energy Marketing Services, ConocoPhillips Company. On March 30, 2022, an intervention was filed by the Canadian Association of Petroleum Producers and on April 13, 2022, an intervention was filed by Enbridge, Inc.

On March 15, 2022, the Association of Oil Pipe Lines ("AOPL") (since renamed the Liquid Energy Pipelines Association or "LEPA") filed a Petition for Review of the January 2022 Rehearing Order in this Court. *See* Petition for Review, *Ass'n of Oil Pipe Lines v. FERC*, Case No. 22-1045 (D.C. Cir. Mar. 15, 2022). On March 22, 2022, AOPL filed a Motion to Transfer this Petition for Review matter to the Fifth Circuit that was granted on March 24, 2022. *See* Order of the Clerk

Granting Unopposed Motion to Transfer, *Ass'n of Oil Pipe Lines v. FERC*, Case No. 22-1045 (D.C. Cir. Mar. 24, 2022). That petition was consolidated with the other Fifth Circuit proceedings on March 28, 2022. *See* Order No. 22-60100, *Buckeye Partners, L.P. v. FERC*, No. 22-60100 (5th Cir. Mar. 28, 2022).

On April 6, 2022, several intervenors[+] in Case No. 22-60100 filed an opposed motion requesting the Fifth Circuit to transfer those consolidated petitions to this Court pursuant to 28 U.S.C. § 2112(a)(5). On May 11, 2022, the Fifth Circuit issued a decision granting that motion. *Buckeye Partners, L.P. v. FERC*, Case No. 22-60100, 2022 WL 1486781 (5th Cir. May 11, 2022) (per curiam), *superseded by* 2022 WL 1528311 (5th Cir. May 13, 2022) (per curiam). All of this Petition and motion practice occurred prior to the issuance of FERC's May 2022 Rehearing Order.

FERC's May 2022 Rehearing Order was issued May 6, 2022. On June 27, 2022, Buckeye Partners, L.P., Colonial Pipeline Company, Energy Transfer, L.P., Enterprise Products Partners, L.P. and Plains All American Pipeline, L.P. filed a petition for rehearing en banc requesting the Fifth Circuit reconsider its May 13, 2022 order transferring Case No. 22-60100 to the D.C. Circuit. On July 15, 2022,

---

[+] Airlines for America, Apache Corporation, Cenovus Energy Marketing Services, Ltd., ConocoPhillips Company, Devon Gas Services, L.P., Marathon Oil Company, Murphy Exploration & Production Company-USA, National Propane Gas Association, Ovintiv Marketing, Incorporated, Pioneer Natural Resources Company USA, Incorporated, Chevron Products Company and Valero Marketing and Supply Company.

responses for and against this petition were submitted at the request of the Fifth

Circuit.  *See* Order Requesting Responses, *Buckeye Partners, L.P. v. FERC*, Case

No. 22-60100 (July 5, 2022).  On September 26, 2022, the Fifth Circuit denied the

carriers' petition, treating it as a petition for panel rehearing.  This case was

transferred to this Court on October 4, 2022.

To the best of Shipper Petitioner's knowledge and belief, besides the

proceedings described above, there are no other related proceedings pending before

the Commission.  There are no other related proceedings pending before this Court,

or any other Federal or state court.

Respectfully submitted,

 /s/ *Richard E. Powers, Jr.*        

Richard E. Powers, Jr.

Matthew D. Field

Venable LLP

600 Massachusetts Avenue, N.W.

Washington, D.C. 20001

(202) 344-4360

REPowers@venable.com

MField@venable.com

*Counsel for Airlines for America and National Propane Gas Association*

 /s/ *Steven A. Adducci*      

Steven A. Adducci

Gregory S. Wagner

William G. Bolgiano

Venable LLP

600 Massachusetts Avenue, N.W.

Washington, D.C. 20001

(202) 344-4361

SAAdducci@venable.com

GSWagner@venable.com

WGBolgiano@venable.com

*Counsel for Chevron Products Company, a division of Chevron U.S.A. Inc. and Valero Marketing and Supply Company*

## TABLE OF CONTENTS

I.    **STATEMENT OF JURISDICTION** ....................................................1

II.   **ISSUES PRESENTED FOR REVIEW** ..........................................2

III.  **STATEMENT OF THE CASE** ......................................................2

IV.  **SUMMARY OF THE ARGUMENT** ............................................7

V.   **STANDING** ...................................................................................9

VI.  **ARGUMENT**.................................................................................10

    A.    Standard of Review .........................................................10

    B.    FERC's Preclusion of Relief for Rates Charged Above Reasonable Index Rate Ceilings Is Arbitrary, Capricious, An Abuse of Discretion, And Unreasonably Departs from Its Own Policy and Precedent Without Any Reasoned Basis..........................13

        1.    FERC's Indexing Regulations Do Not Permit FERC to Establish Two Index Factors During the Same Index Year ....................................................................................13

        2.    FERC's Novel Interpretation of Its Indexing Regulations So Departs from The Unambiguous Text, Structure, History, And Purpose of Such Regulations that FERC Creates a New *De Facto* Regulation Without Proper Notice and Comment Rulemaking............................................22

        3.    FERC's Decision to Preclude Shippers from Seeking Relief from Being Charged Rates Exceeding Index Ceilings Deemed Reasonable Violates Statutory Requirements and Deviates Without Basis from Established Precedent ...............................................26

            a.    Precedent Dictates that Placing Shippers in the Same Position They Would Have Been in but for an Agency's Error is the Norm Absent Extraordinary Circumstances....................................................28

            b.    FERC's Bases for Denying Shippers Their Requested Relief Are Irreconcilable with Its Governing Statutes .........................................30

xii

        c.    FERC's May 2022 Rehearing Order Drastically Departs from Precedent Without Reasoned or Rational Justification ......................................................34

**VII.  CONCLUSION** ...........................................................................**42**

# TABLE OF AUTHORITIES

**Page(s)**

## COURT CASES

*Am. Pub. Gas Ass'n v. Dep't of Energy*,
22 F.4th 1018 (D.C. Cir. 2022) ................................................................... 19, 23

*ANR Pipeline Co. v. FERC*,
71 F.3d 897 (D.C. Cir. 1995) ............................................................................ 11

*Ass'n of Oil Pipe Lines v. FERC*,
83 F.3d 1424 (D.C. Cir. 1996) ..................................................................... 1, 2, 3

*Ass'n of Oil Pipe Lines v. FERC*,
281 F.3d 239 (D.C. Cir. 2002) ............................................................................ 3

*Ass'n of Oil Pipe Lines v. FERC*,
876 F.3d 336 (D.C. Cir. 2017) ............................................................................ 3

*Associated Gas Distribs. v. FERC*,
824 F.2d 981 (D.C. Cir. 1987) .......................................................................... 11

*Balt. Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020) .......................................................................... 12

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) .............................................................................. 23

*Columbia Gas Transmission Corp. v. FERC*,
895 F.2d 791 (D.C. Cir. 1990) .......................................................................... 32

*CSX Transp., Inc. v. STB*,
584 F.3d 1076 (D.C. Cir. 2009) ........................................................................ 25

*Earth Res. Co. of Alaska v. FERC*,
628 F.2d 234 (D.C. Cir. 1980) ............................................................................ 1

\* *Exxon Co., U.S.A. v. FERC*,
182 F.3d 30 (D.C. Cir. 1999) ................................................... 12, 29, 33, 34, 35

*Farmers Union Cent. Exch., Inc. v. FERC*,
734 F.2d 1486 (D.C. Cir. 1984) ................................................................... 11, 29

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Fla. Power & Light Co. v. United States*,
846 F.2d 765 (D.C. Cir. 1988) ........................................................... 25

*Flagstaff Broad. Found. v. FCC*,
979 F.2d 1566 (D.C. Cir. 1992) ......................................................... 11

*Flying J Inc. v. FERC*,
363 F.3d 495 (D.C. Cir. 2004) ............................................................. 3

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .............................................................. 12, 23

*La. Pub. Serv. Comm'n v. FERC*,
772 F.3d 1297 (D.C. Cir. 2014) .................................................. 11, 38

*MarkWest Mich. Pipeline Co., LLC v. FERC*,
646 F.3d 30 (D.C. Cir. 2011) ........................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................... 10

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) ....................................................... 25

*Newman v. FERC*,
27 F.4th 690 (D.C. Cir. 2022) .................................................... 12, 23

*Off. of Consumers' Couns., Ohio v. FERC*,
826 F.2d 1136 (D.C. Cir. 1987) ....................................................... 32

* *Panhandle E. Pipe Line Co. v. FERC*,
613 F.2d 1120 (D.C. Cir. 1979) .................................................. 16, 17

*Pub. Servs. Co. of Colo. v. FERC*,
91 F.3d 1478 (D.C. Cir. 1996) ......................................................... 29

*Sw. Airlines Co. v. FERC*,
926 F.3d 851 (D.C. Cir. 2019) .................................................... 11, 14

*Tenn. Valley Mun. Gas Ass'n v. FPC*,
470 F.2d 446 (D.C. Cir.1972) .......................................................... 29

*United Gas Imp. Co. v. Callery Props., Inc.*,
382 U.S. 223 (1965) ..................................................................28

*W & M Props. of Conn., Inc. v. NLRB*,
514 F.3d 1341 (D.C. Cir. 2008) ...............................................11

\* *Waterkeepers Chesapeake v. FERC*,
56 F.4th 45 (D.C. Cir. 2022) ...................................................16

**ADMINISTRATIVE CASES**

\* *Energy Transfer GC NGL Pipelines LP*,
178 FERC ¶ 61,132 (2022) .................................................40, 41

\* *Five-Year Rev. of Oil Pipeline Pricing Index*,
102 FERC ¶ 61,195 (2003) ............................ 35, 36, 37, 38, 39, 40

*Five-Year Rev. of the Oil Pipeline Index*,
171 FERC ¶ 61,239 (2020) .............................................3, 25, 26

*Five-Year Rev. of the Oil Pipeline Index*,
173 FERC ¶ 61,245 (2020) ....................................................3, 26

*Five-Year Rev. of the Oil Pipeline Index*,
178 FERC ¶ 61,023 (2022) ................... 3, 4, 5, 6, 7, 13, 19, 27, 31, 32, 40, 42

*Five-Year Rev. of the Oil Pipeline Index*,
179 FERC ¶ 61,100 (2022) ......................... 6, 13, 14, 15, 21, 23, 30,
..................................................................31, 32, 34, 36, 37, 38, 40

*La. Pub. Serv. Comm'n v. Entergy Corp.*,
132 FERC ¶ 61,133 (2010) ......................................................38

*MarkWest Mich. Pipeline Co., L.L.C.*,
130 FERC ¶ 61,084 (2010) ......................................................18

*Platte Pipe Line Co.*,
117 FERC ¶ 61,296 (2006) ......................................................29

*R. Gordon Gooch v. Colonial Pipeline Co.*,
142 FERC ¶ 61,220 (2013) ......................................................33

\* *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*,
   Order 561,
   FERC Stats. & Regs. ¶ 30,985, 58 Fed. Reg. 58,753 (1993) ...............2, 3, 8, 15,
   ....................................................................................................17, 18, 20, 30, 33

\* *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*,
   Order 561-A,
   FERC Stats. & Regs. ¶ 31,000, 59 Fed. Reg. 40,243 (1994) .................2, 21, 22,
   ...............................................................................................................31, 35, 36

*Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*,
   175 FERC ¶ 61,117, 86 Fed. Reg. 27,847 (2021) ...........................................2, 4

*Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*,
   178 FERC ¶ 61,046, 87 Fed. Reg. 4,008 (2022) .............................................2, 4

\* *SFPP, L.P.*,
   71 FERC ¶ 61,425 (1995).........................................................................34, 40

*Suncor Energy Mktg. Inc. v. Platte Pipe Line Co.*,
   132 FERC ¶ 61,242 (2010) .............................................................................29

**STATUTES AND REGULATIONS**

18 C.F.R. § 342.3[Δ]................................................... 2, 3, 5, 15, 18, 20, 21, 23, 24, 25

18 C.F.R. § 343.2[Δ]........................................................................8, 14, 20, 24, 35

5 U.S.C. § 553 .................................................................................................25

5 U.S.C. § 706 .................................................................................................10

28 U.S.C. § 2321 ...............................................................................................1

28 U.S.C. § 2342 ...............................................................................................1

28 U.S.C. § 2344 ...............................................................................................1

42 U.S.C. § 7192 ...............................................................................................1

[Δ]   Relevant excerpts included in the Statutory and Regulatory Addendum attached hereto.

Energy Policy Act of 1992,[Δ]
   § 1801, Pub. L. No. 102-486, 106 Stat. 2776, 3010 ...... 1, 2, 7, 20, 29, 30, 31, 33

Interstate Commerce Act, [Δ]
   49 U.S.C. app. § 1, *et seq.* (1988) ........................................................... 1

   49 U.S.C. app. § 1(5) (1988)................ 8, 9, 20, 22, 24, 26, 27, 28, 30, 31, 32, 33

   49 U.S.C. app. § 6(1) (1988)................................................................. 40

   49 U.S.C. app. § 13(1) (1988) .............................................................. 22

   49 U.S.C. app. § 15(7) (1988) .............................................................. 30

   49 U.S.C. app. § 16(3)(b) (1988)...................................................... 8, 14

---

[Δ]    Relevant excerpts included in the Statutory and Regulatory Addendum attached hereto.

# GLOSSARY

| | |
|---|---|
| 2020 Order | *Five-Year Rev. of the Oil Pipeline Index*, 173 FERC ¶ 61,245 (2020) |
| 2021 Notice | Notice of Annual Change in The Producer Price Index for Finished Goods, *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, 175 FERC ¶ 61,117, 86 Fed. Reg. 27,847 (May 24, 2021) |
| 2022 Notice | Notice of Annual Change in The Producer Price Index for Finished Goods, *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, 178 FERC ¶ 61,046, 87 Fed. Reg. 4,008 (Jan. 26, 2022) |
| EPAct 1992 | Energy Policy Act of 1992,[Δ] Pub. L. No. 102-486, 106 Stat. 2776 |
| FERC or Commission | Federal Energy Regulatory Commission |
| FERC Indexing Program | The system codified in 18 C.F.R. § 342.3 issued in Orders 561 and 561-A pursuant to EPAct 1992 designed to allow oil and petroleum product pipeline rates to keep pace with inflation-driven cost changes via a simplified cost-based ratemaking method |
| ICA | Interstate Commerce Act,[Δ] 49 U.S.C. app. § 1, *et seq.* (1988) |

---

[Δ]    Relevant excerpts included in the Statutory and Regulatory Addendum attached hereto.

| Index Factor | The numerical Index value that is multiplied by a carrier's prior Index ceiling level(s) to obtain the higher or lower rate ceilings for the next Index Year. This Index factor changes from year to year based on the percent change in the PPI-FG over the preceding calendar year plus or minus the Index differential + 1.00. The Index differential is the positive or negative adjustment to the percent change in the PPI-FG which is calculated in FERC's five-year review based on the pipeline industry's cost change as compared to the PPI-FG over the preceding five years. |
|---|---|
| Index Year | The period from July 1 to June 30 |
| January 2022 Rehearing Order | *Five-Year Rev. of the Oil Pipeline Index*, 178 FERC ¶ 61,023 (2022) |
| May 2022 Rehearing Order | *Five-Year Rev. of the Oil Pipeline Index*, 179 FERC ¶ 61,100 (2022) |
| Order 561 | *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, Order 561, FERC Stats. & Regs. ¶ 30,985, 58 Fed. Reg. 58,753 (Oct. 22, 1993) |
| Order 561-A | *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, Order 561-A, FERC Stats. & Regs. ¶ 31,000, 59 Fed. Reg. 40,243 (Aug. 8, 1994) |
| PPI-FG | Producer Price Index for Finished Goods |
| Revised Index Ceiling Levels | The ceiling levels resulting from application of the Revised Index factor. |
| Revised Index Factor | The Index factor resulting from the January 2022 Rehearing Order, i.e., PPI-FG minus 0.21% (PPI-FG-0.21%) |
| Shipper Petitioners | Air Transport Association of America, Inc., d/b/a Airlines for America, Chevron Products Company, a division of Chevron U.S.A. Inc., National Propane Gas Association, and Valero Marketing and Supply Company |

Shipper Petitioners hereby file their Opening Brief.

## I.    STATEMENT OF JURISDICTION

Shipper Petitioners challenge orders of FERC issued under the authority of the Interstate Commerce Act ("ICA"),[1] which governs the rates charged by interstate pipelines for the transportation of crude oil and petroleum products, and the Energy Policy Act of 1992 ("EPAct 1992"),[2] which is the genesis of FERC's existing Index ratemaking regime for oil pipelines.

This Court has jurisdiction to review the subject orders under section 17 of the ICA and under 42 U.S.C. § 7192(a), which granted this Court the same authority to review final FERC orders under the ICA as the Court had to review orders of the Interstate Commerce Commission under 28 U.S.C. §§ 2321 and 2342 at the time of the enactment of 42 U.S.C. § 7192(a).[3]

FERC's final order denying rehearing was issued on May 6, 2022.  That order disposed of all the remaining claims and arguments in the proceeding before FERC.  Shipper Petitioners' consolidated petitions were timely filed under 28 U.S.C. § 2344.

---

[1]    49 U.S.C. app. § 1, *et seq.* (1988).

[2]    *See* section 1801, Pub. L. No. 102-486, § 1801, 106 Stat. 2776, 3010.

[3]    *See Earth Res. Co. of Alaska v. FERC*, 628 F.2d 234 (D.C. Cir. 1980); *see also Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1432 n.14 (D.C. Cir. 1996) ("*AOPL I*").

## II.    ISSUES PRESENTED FOR REVIEW

Whether FERC's decision to preclude shipper relief against pipelines whose rates exceeded their recomputed Index rate ceilings between July 1, 2021 through February 28, 2022 was arbitrary, capricious, an abuse of discretion, and contrary to law.

## III.    STATEMENT OF THE CASE

These consolidated petitions arise from FERC's periodic review of its Indexing program for interstate liquid pipeline rate changes.  FERC created that program through Order 561 following the enactment of EPAct 1992.[4]  Under this Indexing program, FERC issues new annual Index factor notices for each Index Year (i.e., July 1 through June 30).[5]  Carriers then multiply the applicable Index factor by their currently effective rate ceilings to calculate ceiling levels to be effective for the next twelve-month Index Year.[6]  FERC selected an Index of the annual change in the Producer Price Index for Finished Goods ("PPI-FG") as a baseline measure for

---

[4]    *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, Order 561, FERC Stats. & Regs. ¶ 30,985, 58 Fed. Reg. 58,753 (Oct. 22, 1993) ("Order 561"), *aff'd* Order 561-A, FERC Stats. & Regs. ¶ 31,000, 59 Fed. Reg. 40,243 (Aug. 8, 1994), *aff'd AOPL I*, 83 F.3d 1424.

[5]    *See, e.g.*, Notice of Annual Change In The Producer Price Index for Finished Goods, *Revisions to Oil Pipeline Reguls. Pursuant to the Energy Pol'y Act of 1992*, 175 FERC ¶ 61,117, 86 Fed. Reg. 27,847 (May 24, 2021) ("2021 Notice"), *as revised* 178 FERC ¶ 61,046, 87 Fed. Reg. 4,008 (Jan. 26, 2022) ("2022 Notice").

[6]    *See* 18 C.F.R. § 342.3.

2

inflation, adjusted to account for "actual cost changes experienced by the [liquid] pipeline industry."[7]

On June 18, 2020, the Commission initiated its fifth five-year Index review proceeding.[8]  FERC adopted an Index factor of PPI-FG+0.78% due, in significant part, to its statistical trimming of the pipeline cost data to the middle 80 percent (versus the middle 50 percent) of cost changes, a departure from the methodology FERC adopted in the prior five-year analysis.[9]  FERC also departed from its Court-approved policy of eschewing subjective manipulation of industry cost data for one particular cost, here the purported normalization of income tax costs, to the exclusion of other cost factors.[10]

Multiple participants sought rehearing of FERC's 2020 Order.  Pending rehearing, however, the Commission made effective the Index factor derived in accordance with the 2020 Order (i.e., PPI-FG+0.78%) for the period "July 1, 2021,

---

[7]     Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,952; *see also* 18 C.F.R. § 342.3(d)(2).  For a history of FERC's five-year Index review proceedings *see AOPL I*, 83 F.3d 1424; *Ass'n of Oil Pipe Lines v. FERC*, 281 F.3d 239 (D.C. Cir. 2002) ("*AOPL II*"); *Flying J Inc. v. FERC*, 363 F.3d 495 (D.C. Cir. 2004); *Ass'n of Oil Pipe Lines v. FERC*, 876 F.3d 336 (D.C. Cir. 2017) ("*AOPL III*").

[8]     *Five-Year Rev. of the Oil Pipeline Index*, 171 FERC ¶ 61,239 (2020) ("Notice of Inquiry"), R.2-(J.A.13).

[9]     *Five-Year Rev. of the Oil Pipeline Index*, 173 FERC ¶ 61,245, at PP 25-32 (2020) ("2020 Order"), R.19-(J.A.758-64), *rev'd* 178 FERC ¶ 61,023 (2022) ("January 2022 Rehearing Order"), R.28-(J.A.956).

[10]    *Id.* at PP 16-20, R.19-(J.A.750-54).

3

through June 30, 2022."[11] A large number of carriers filed revised tariffs to make effective, as of July 1, 2021 for the 2021 Index Year, higher Index rate ceilings corresponding to the Index factor approved in the 2020 Order.

On January 20, 2022, FERC issued its first Rehearing Order which granted, in large part, shipper requests for rehearing of the 2020 Order.[12] FERC explained that the 2020 Order erred in its method of trimming the cost data to remove anomalous costs as well as its manipulation of income tax costs for certain pipelines to the exclusion of any other cost factors.[13]

After making these corrections, FERC established an Index factor of PPI-FG-0.21% (i.e., PPI-FG minus 0.21%) for the five-year period beginning July 1, 2021[14]—a reduction from the previously approved Index factor of PPI-FG+0.78%. The Commission directed that "pipelines must revise the ceiling levels that became effective July 1, 2021, to reflect an index level of PPI-FG-0.21%"[15] and "recompute

---

[11]    2021 Notice, 175 FERC ¶ 61,117, at 61,638-39.

[12]    January 2022 Rehearing Order, 178 FERC ¶ 61,023 at PP 8-58, R.28-(J.A.963-1007).

[13]    *Id.* at PP 22-27, 51-54, R.28-(J.A.975-80, 1001-03).

[14]    *Id.* at P 105, R.28-(J.A.1048).

[15]    *Id.* at P 106, R.28-(J.A.1048-49) (citing 2022 Notice, 178 FERC ¶ 61,046). *See also* 2021 Notice, 175 FERC ¶ 61,117, at 61,638 n.1 (noting that the December 2020 Order was pending rehearing).

4

their ceiling levels for July 1, 2021 through June 30, 2022."[16]  The Commission directed carriers with rates that exceeded their Revised Index ceiling levels to file reduced rates to bring them "into compliance with the pipeline's recomputed ceiling level as required by § 342.3(e) of the Commission's regulations"[17] and ordered that such revised Index rate ceilings were to be effective no later than March 1, 2022.[18] For those carriers whose existing rates were below the Index rate ceilings resulting from the revised Index factor, no tariff filing was necessary.

Shipper Petitioners timely sought clarification and/or rehearing that (i) the Revised Index factor applies for the entire Index Year of July 1, 2021-June 30, 2022, and (ii) shippers may pursue case-by-case relief to the extent a carrier's rates charged prior to March 1, 2022 exceeded the Revised Index rate ceilings.[19]  Shipper Petitioners argued the January 2022 Rehearing Order was ambiguous as to whether the Commission intended for its Revised Index ceilings to be effective only as of March 1, 2022, rather than for the entire Index Year beginning July 1, 2021.[20]

---

[16]     January 2022 Rehearing Order, 178 FERC ¶ 61,023 at Ordering Para. (B), R.28-(J.A.1049).

[17]     *Id.* at P 106, R.28-(J.A.1048-49).

[18]     *Id.* at Ordering Para. (C), R.28-(J.A.1050).

[19]     Shipper Petitioners' Request for Clarification, or, in the Alternative Rehearing (Feb. 22, 2022), R.30-(J.A.1058) ("Shipper Petitioner Clarification Request").

[20]     *Id.* at 4-12, R.30-(J.A.1067-75).

Shipper Petitioners identified two possible readings of the relevant portions of the January 2022 Rehearing Order.

The first reading was that the Order instructed carriers to recalculate their Index rate ceilings applicable to the entire Index Year of July 1, 2021 to June 30, 2022 and to adjust rates in excess of the Revised Index ceiling levels to be effective as of March 1, 2022.[21]  Alternatively, the Order may have inappropriately intended to establish two distinct Index factors and related ceiling levels that apply during different parts of the Index Year from July 1, 2021 to June 30, 2022:  one calculated using an Index factor of PPI-FG+0.78% and applicable from July 1, 2021 to February 28, 2022, and another calculated using the Revised Index factor of PPI-FG-0.21% applicable from March 1, 2022 to June 30, 2022.[22]  Shipper Petitioners sought specific clarification that the Commission intended the former (and not the latter) reading, which was consistent with precedent and existing statutory and regulatory dictates of placing participants in the same position they would have been in but for the agency's error.

On May 6, 2022, FERC issued its second Rehearing Order ("May 2022 Rehearing Order"),[23] rejecting Shipper Petitioners' request to clarify, or in the

---

[21]     *Id.* at 6-9, R.30-(J.A.1069-72).

[22]     *Id.* at 6, 16-18 R.30-(J.A.1069, 1079-81).

[23]     *Five-Year Rev. of the Oil Pipeline Index*, 179 FERC ¶ 61,100 (2022) ("May 2022 Rehearing Order"), R.40-(J.A.1102).

alternative, grant rehearing of the January 2022 Rehearing Order. In doing so, FERC denied Shipper Petitioners the opportunity to seek relief on a case-by-case basis, for instances where they were required to pay rates in excess of the Revised Index ceiling levels for the period July 1, 2021 through February 28, 2022.[24] FERC stated that this exercise of discretion was reasonable and consistent with the simplified and streamlined ratemaking endorsed in EPAct 1992 as well as past precedent.[25]

## IV.  SUMMARY OF THE ARGUMENT

This is not a close case. FERC initially allowed pipelines to increase their Index rate ceilings by a certain amount as of July 1, 2021 but later determined that permitting increases of that magnitude was both in error and unreasonable. FERC then implemented a lesser annual Index factor and resulting lower rate ceilings but inexplicably allowed carriers to leave the earlier increase in place from July 1, 2021 through February 28, 2022 and only implement the lower Index factor as of March 1, 2022. As a result, every pipeline with rates at or very near its Index ceiling levels charged rates for 8 months that FERC acknowledges were excessive and unreasonable, yet FERC nevertheless barred shippers from seeking relief to make them whole after paying these unjust and unreasonable rates.

---

[24]    *Id.* at PP 7-14, R.40-(J.A.1106-1111).

[25]    *Id.*, R.40-(J.A.1106-1111).

FERC's decision to establish two separate Index factors to govern different portions of the July 1, 2021 to June 30, 2022 Index Year is contrary to FERC's unambiguous regulations, FERC precedent, and the purpose of the ICA and is unsupported under the facts of this case.

From the inception of its Indexing regime FERC has been clear that "the Commission will allow updating of the index only on an annual basis."[26]  FERC's Indexing regulations clearly only contemplate one Index factor and related set of rate ceilings in any given Index Year.  FERC's May 2022 Rehearing Order must be vacated because it violates the unambiguous language of its governing regulations.  Indeed, FERC's novel interpretation of its Indexing regulations so departs from the text, history, and purpose of such regulations that FERC improperly creates a new de facto regulation contrary to proper notice and comment rulemaking.

Even if FERC's interpretation of its regulations were permissible, FERC would be wrong to foreclose shippers from seeking relief.  Shippers are entitled under the ICA to seek damages for unjust and unreasonable rates going back two years.[27]  FERC already determined that the Index factor that pipelines applied from July 1, 2021 to March 1, 2022 was unreasonable, and FERC and this Court have repeatedly emphasized the strong presumption that FERC will make parties whole

---

[26]     Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,954.

[27]     49 U.S.C. app. § 16(3)(b) (1988); 18 C.F.R. § 343.2(c)(1).

when they pay unlawfully high rates.  This is especially true where, as here, such rates went into effect as a result of FERC's own error.

FERC recognized that its initial selection of an Index factor may be revised and even specifically stated that pipelines may be entitled to surcharges if this Court orders a remand that results in a higher Index factor.  But it refused to grant the reciprocal right to shippers.  Under FERC's rulings, if the Index factor is increased, pipelines will be made whole; but if the Index factor decreases, pipelines retain the unreasonable windfall and shippers have no recourse.  FERC's actions are arbitrary, capricious, and unlawful and must be reversed and remanded with instructions to permit shippers to seek relief to which they are entitled under the ICA.

## V.    STANDING

Shipper Petitioners have standing to petition for review of the FERC orders because the orders establish the Index ceiling levels directly impacting the rates for interstate oil pipeline transportation services that each of the Shipper Petitioners purchase from interstate oil and petroleum product pipelines across the country. FERC's preclusion of Shipper Petitioners' ability to seek relief associated with Index rates charged in excess of reasonable Index rate ceilings caused an injury in fact as Shipper Petitioners were required to pay rates in excess of reasonable levels without any opportunity for relief.  A decision reversing FERC's orders as it respects shippers' ability to seek relief for being charged unreasonable rates, and remanding

9

the same, will redress the injury suffered by Shipper Petitioners by (i) giving them an opportunity to seek appropriate relief for having to pay Index-derived rates in excess of reasonable Index ceiling levels and (ii) placing Shipper Petitioners in the same position they would have been in but for FERC's erroneous 2020 Order.

## VI.    ARGUMENT

### A.    Standard of Review

Under the Administrative Procedure Act, a court is required to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[28]  In determining whether agency action is arbitrary and capricious or an abuse of discretion, a reviewing court must determine whether the agency has engaged in reasoned decision-making.[29]  In doing so, the reviewing court must "conduct a 'searching and careful' inquiry" and "assure itself that the agency has examined the relevant data and articulated a reasoned explanation for its action including a 'rational connection between the facts found and the choice

---

[28]    5 U.S.C. § 706(2)(C).

[29]    *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

made.'"[30] It is "axiomatic . . . that an agency's action will be set aside . . . whenever the agency fails to provide a reasoned basis for its decision."[31]

Moreover, the agency must also explain inconsistencies between its current and prior decisions.[32] While FERC may "depart from a prior policy or line of precedent . . . it must acknowledge that it is doing so and provide a reasoned explanation,"[33] and absent such explanation "its decision will be vacated as arbitrary and capricious."[34] "[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute."[35] When an agency deviates from its own precedent, it must "'display awareness that

---

[30]    *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1499 (D.C. Cir. 1984) ("*Farmers Union II*") (citations and footnote omitted); *see also Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1006 (D.C. Cir. 1987).

[31]    *Flagstaff Broad. Found. v. FCC*, 979 F.2d 1566, 1569 (D.C. Cir. 1992) (citations omitted).

[32]    *See, e.g.*, *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 859 (D.C. Cir. 2019) ("we emphasize" that FERC "must explain its actions in a way that coheres with the rest of its indexing scheme").

[33]    *La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1303 (D.C. Cir. 2014) (citations omitted).

[34]    *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995).

[35]    *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1347 (D.C. Cir. 2008) (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

it is changing position,' show 'the new policy is permissible under the statute,' and 'show that there are good reasons for the new policy.'"[36]

A court must "carefully consider the text, structure, history, and purpose of a regulation" before providing any deference to an alleged agency interpretation.[37] When an agency radically departs from the import and meaning of its unambiguous regulations, "under the guise of interpreting a regulation," the agency unlawfully "create[s] de facto a new regulation" contrary to notice and comment rulemaking.[38]

Finally, while FERC maintains a "measure of discretion" in addressing remedies, including whether to apply rates retroactively, "such discretion is not without its limits."[39]  It is an abuse of such remedial discretion where it is exercised in a manner contrary to reasoned decisionmaking or the dictates of governing statutes and regulations.[40]

---

[36]    *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

[37]    *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019).

[38]    *Newman v. FERC*, 27 F.4th 690, 697 (D.C. Cir. 2022) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000); *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 211 (2011)).

[39]    *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999).

[40]    *Id*. at 49-50.

**B.** **FERC's Preclusion of Relief for Rates Charged Above Reasonable Index Rate Ceilings Is Arbitrary, Capricious, An Abuse of Discretion, And Unreasonably Departs from Its Own Policy and Precedent Without Any Reasoned Basis**

**1.** **FERC's Indexing Regulations Do Not Permit FERC to Establish Two Index Factors During the Same Index Year**

The January 2022 Rehearing Order and related 2022 Notice corrected and consequently lowered the Index factor for the Index Year of July 1, 2021-June 30, 2022 from that established in the 2020 Order. In the May 2022 Rehearing Order, FERC rejected Shipper Petitioners' request to confirm that the January 2022 Rehearing Order, notwithstanding the inconsistency of its relevant language,[41] intended to direct carriers to apply the Revised Index factor and recalculate Index rate ceilings applicable for the *entire* Index Year of July 1, 2021-June 30, 2022 and to conform existing rates to such reasonable Index rate ceilings effective March 1, 2022. Shipper Petitioners explained that such confirmation was necessary to avoid

---

[41] FERC contended its January 2022 Rehearing Order "unambiguously" provided for two separate Index factors and consequently two sets of Index rate ceilings for Index Year July 1, 2021-June 30, 2022. May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 8, R.40-(J.A.1106). FERC's contention is wrong given that both the pipeline industry and the Shipper Petitioners understood that order to establish only one Index factor and resulting set of Index rate ceilings applicable for the entire 2021 Index Year. *See* Answer of AOPL to Shipper Petitioners' Request for Clarification at 2 (Mar. 3, 2022), R.31-(J.A.1090) (agreeing with Shipper Petitioners' contention and claiming that request for clarification was unnecessary). FERC's unilateral contention as to the clarity and consistency of its January 2022 Rehearing Order is not shared by either the shipper community or the pipeline industry. *See also* Response of Designated Carriers to Request for Clarification of Shipper Petitioners at 3 (Mar. 7, 2022), R.32-(J.A.1098) (supporting AOPL).

any ambiguity regarding shippers' ability to be made whole from FERC's earlier errors in its 2020 Index Order that allowed pipelines to use an excessive Index factor to calculate and charge rates in excess of the Revised Index rate ceilings.

FERC asserted that its Indexing regime and regulations do not prohibit the establishment of two separate Index factors and related rate ceilings for liquid pipelines within an Index Year. FERC further held it was properly within its remedial discretion to refuse to apply the Revised Index rate ceilings as of the beginning of the Index Year on July 1, 2021.[42] FERC's determinations do not withstand scrutiny.

Under normal operation of the ICA and Commission rules, shippers are entitled to file complaints within two years against a rate that "violates the applicable ceiling level."[43] Shippers may therefore pursue case-by-case relief against carriers where they paid rates in excess of the reasonable Index rate ceilings for the period July 1, 2021 through February 28, 2022. Contrary to FERC's assertions, this interpretation is required by the relevant regulations, as well as statutory dictates, and consistent with Commission precedent.

---

[42]    *See* May 2022 Rehearing Order, 179 FERC ¶ 61,100 at PP 9-12, R.40-(J.A.1106-09).

[43]    18 C.F.R. § 343.2(c)(1); 49 U.S.C. app. § 16(3)(b) (1988) (allowing two years of reparations under the ICA); *see also Sw. Airlines*, 926 F.3d 851.

14

FERC's Indexing process and related regulatory authority provide for only one Index factor for developing Index rate ceilings during an Index Year, absent the use of an alternative ratemaking methodology. Section 342.3(c) provides that "[t]he index year is the period from July 1 to June 30."[44] Section 342.3(d)(1) states that every "carrier must compute the ceiling level for *each index year*" using the applicable Index factor.[45] Further, section 342.3(e) states that a carrier "must" lower rates that exceed the Index ceiling and that this "must be accomplished by filing a revised tariff publication with the Commission to *be effective July 1 of the index year* to which the reduced ceiling level applies."[46] More than one set of rate ceilings can only occur within an Index Year when a rate is changed by a method other than the Indexing process.[47]

FERC dismissed this plain reading of its regulations and instead contended that they are inapplicable when FERC revises the applicable Index factor and

---

[44]    18 C.F.R. § 342.3(c) (emphasis added).

[45]    18 C.F.R. § 342.3(d)(1) (emphasis added).

[46]    18 C.F.R. § 342.3(e) (emphasis added).

[47]    *See* 18 C.F.R. § 342.3(d)(5); *see also MarkWest Mich. Pipeline Co., LLC v. FERC*, 646 F.3d 30, 32-33 (D.C. Cir. 2011) (describing the alternative rate methods, other than Indexing). FERC made plain in Order 561 that where a carrier believes its Index rate ceilings fail to yield reasonable rates, it can use alternative ratemaking methods. Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,955.

corresponding Index rate ceilings on rehearing of its decision on a five-year review.[48]

FERC provided no reason that the procedural posture of this case would merit departing from its regulations; indeed, FERC's discussion of this point is merely a description of the result it reached, not a justification. FERC wrongly posits the issue as relating to its discretionary authority to revise an existing reasonable rate; the actual issue is the effectiveness of rates FERC itself has already deemed unreasonable.

This Court recently reminded FERC it does not have the power to imply regulatory powers where the governing authority—in that case, a statute—does not expressly proscribe FERC's desired actions.[49] In *Waterkeepers*, this Court explained that it has "repeatedly rejected the notion that the absence of an express proscription allows an agency to ignore a proscription implied by the limiting language of a statute."[50]

This same principle is applicable to an agency's interpretation of its own regulations. In *Panhandle Eastern Pipe Line Co. v. FERC*, FERC argued that even though the regulations it sought to apply did not speak to the facts of the case,

---

[48]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at PP 10-11, R.40-(J.A.1107-09).

[49]    *See Waterkeepers Chesapeake v. FERC*, 56 F.4th 45 (D.C. Cir. 2022) ("*Waterkeepers*").

[50]    *Id.* at 49 (quoting *S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 24 (D.C. Cir. 1999)).

16

"nothing specifically precludes using these mechanisms to respond to the Commission's regulatory purposes" and that its "powers must be construed broadly in the public interest."[51]  This Court held that FERC does not have "authority to play fast and loose with its own regulations.  It has become axiomatic that an agency is bound by its own regulations.  The fact that a regulation as written does not provide FERC a quick way to reach a desired result does not authorize it to ignore the regulation . . . ."[52]

Here the text, structure, history, and purpose of the Indexing regulations provide for a single annual Index factor, absent alternative ratemaking methods, to be applicable to each Index Year from July 1 through June 30 in all situations. There is no basis for FERC's reading that would apply multiple Index factors and related Index rate ceilings over a single Index Year, especially where FERC explicitly found the earlier Index factor to be unreasonable, solely because it is acting on rehearing.

FERC's statements promulgating its Indexing regulations reinforce this point. In Order 561, FERC explained that based on its Indexing methodology, "[e]ach pipeline will establish *an annual ceiling level for each of its rates*."[53]  Similarly,  the Commission explained that "[t]he index is intended to limit the amount by which a

---

[51]    613 F.2d 1120, 1135 (D.C. Cir. 1979) (quoting Respondent's Brief).

[52]    *Id.*

[53]    Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,953 (emphasis added).

rate may be increased on an *annual basis*," and the Commission imposed limits in order to preserve "the policy that the *ceiling level is established on an annual basis, to be applied during an index year*."[54]  The only circumstance under which a given rate may be subject to two different ceiling levels within the same Index Year is where the pipeline uses another of the approved ratemaking methodologies.  In that case, the newly filed rate "will constitute the applicable ceiling level for that index year."[55]

Indeed, Order 561 specifically explained, contrary to FERC's current claims, that when using its Indexing methodology, there can only be one Index factor and corresponding set of Index rate ceilings within an Index Year:

> If the rate in effect is changed during the year *through a method other than indexing*, or if the rate in question is an initial rate established during the year, *then the pipeline must defer any rate change pursuant to the indexing system to the next subsequent adjustment date—i.e., the following July 1.  This limitation is to preserve the integrity of the annual indexing concept.  The index is intended to limit the amount by which a rate may be increased on an annual basis*.[56]

---

[54]     *Id.* at 30,954 (emphasis added).

[55]     18 C.F.R. § 342.3(d)(5).

[56]     Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,954 (emphasis added) (citing 18 C.F.R. § 342.3(d)(5)).

FERC further confirmed that the concept of multiple rate ceilings within an Index Year would "be contrary to the policy that the ceiling level is established on an annual basis [within its Indexing system], to be applied during an index year."[57]

FERC has established two Index factors and two Index rate ceilings applicable to the same Index Year July 1, 2021-June 30, 2022: (i) PPI-FG+0.78%, used to calculate Index rate ceilings for the period July 1, 2021 to February 28, 2022 and (deemed *unreasonable* by the January 2022 Rehearing Order); and (ii) PPI-FG-0.21%, used to calculate the Index rate ceilings for the period from March 1, 2022 to June 30, 2022 and deemed *reasonable*.  Importantly, FERC never confronts the import of its novel interpretation, specifically that it allows an unreasonable ceiling level to remain in place for part of the Index Year.  This failure to acknowledge the implications of its decision renders its order arbitrary and capricious.[58]

FERC fails to acknowledge or confront the fact that its novel interpretation gives effect to and allows to stay in place, without recourse by shippers, rates up to an Index ceiling level that were (i) never final and (ii) specifically deemed

---

[57]    *Id*.; *see also MarkWest Mich. Pipeline Co., L.L.C.*, 130 FERC ¶ 61,084, at PP 15-16 (2010) (FERC explaining its intent when implementing its Indexing regulations).

[58]    *See Am. Pub. Gas Ass'n v. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022)) (internal citations omitted).

unreasonable.[59]  Nor does FERC reconcile this outcome with the ICA's prohibition against unreasonable rates,[60] or FERC's regulations specifically allowing for complaints to be filed against rates in excess of appropriate Index rate ceilings.[61]

A rate that is not just and reasonable is prohibited and unlawful and nothing in EPAct 1992's direction for a more streamlined and efficient rate-changing mechanism or in FERC's regulations trumps this statutory requirement.  As Order 561 clarified, EPAct 1992 required FERC's simplified methodology to adhere to the dictates of section 1(5) of the ICA.[62]  By allowing pipelines to charge rates that exceed reasonable Index ceilings—and adhere to ceiling levels FERC specifically deemed unreasonable—FERC acted in violation of the dictates of ICA section 1(5).

FERC likewise fails to meaningfully reconcile its interpretation with section 18 C.F.R. § 342.3(e), as Shipper Petitioners highlighted.[63]  Instead, FERC simply

---

[59]    January 2022 Rehearing Order, 178 FERC ¶ 61,023 at PP 22-27, 51-54, R.28-(J.A.975-80, 1001-03).

[60]    *See* 49 U.S.C. app. § 1(5)(a) (1988) ("All charges made for any service rendered or to be rendered" for oil pipeline transportation or in connection therewith "shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful.").

[61]    *See* 18 C.F.R. § 343.2(c)(1).

[62]    Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,947-48.  *See also id.* at 30,940, 30,944, 30,946, 30,949.  *See also* EPAct 1992 § 1801, 106 Stat. at 3010 (requiring the "simplified and generally applicable ratemaking methodology for oil pipelines [to be made] in accordance with section 1(5) of [the ICA].").

[63]    Shipper Petitioner Clarification Request at 7, R.30-(J.A.1070).

20

notes that section 342.3(e) "direct[s] pipelines to revise their rates effective July 1 when necessary under a negative index" and then summarily concluded that "[n]othing in these regulations mandates that ceiling levels, once made effective July 1, may not be recalculated where the Commission revises the underlying index level on rehearing in a five-year review."[64]   FERC misapprehends its own applicable regulation.

Section 342.3(e) provides, in relevant part, that "If the ceiling level computed pursuant to § 342.3(d) [i.e., Indexing] is below the filed rate of a carrier, that rate *must be reduced to bring it into compliance with the new ceiling level . . . .* The rate decrease must be accomplished by filing a revised tariff publication with the Commission to be effective July 1 of the index year to which the reduced ceiling level applies."[65]   Contrary to FERC's contention, the only reasonable reading of this regulatory provision is that whenever FERC's Indexing system, whether as part of annual changes or the agency's five-year review, establishes the reasonable Index factor and resulting Index rate ceilings for an Index Year, the Index factor and rate ceilings apply to the entire Index Year absent the use of alternative ratemaking methods.  Further, where a carrier's rates exceed such Index rate ceilings, the carrier must reduce such rates to comport with the reasonable Index level.

---

[64]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 10, R.40-(J.A.1107-08).

[65]    18 C.F.R. § 342.3(e).

Nowhere does this provision allow for multiple Index factors and Index rate ceilings within an Index Year.  In Order 561-A, FERC clarified that in any Index Year where the approved Index factor "has the effect of lowering the applicable rate ceiling, a pipeline with a rate above the new ceiling must file a new tariff to bring that rate into compliance with the new ceiling" and this filing "must be *effective* no later than July 1 of the applicable index year."[66]  A plain reading of FERC's Indexing regulations does not contemplate multiple Index factors and corresponding Index rate ceilings within an Index Year absent the use of alternative ratemaking methods, and there are no exceptions.  Accordingly, FERC's determination does not reflect reasoned or rational decisionmaking.

> **2.    FERC's Novel Interpretation of Its Indexing Regulations So Departs from The Unambiguous Text, Structure, History, And Purpose of Such Regulations that FERC Creates a New *De Facto* Regulation Without Proper Notice and Comment Rulemaking**

FERC's unambiguous regulations provide that, absent the use of alternative ratemaking methodologies, (i) one Index factor and resulting set of Index rate ceilings may be in effect during any Index Year, and (ii) shippers are entitled to seek relief from rates that exceeded such approved Index rate ceilings.[67]  In direct contravention of these regulations, the May 2022 Rehearing Order precludes

---

[66]    Order 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,099 (emphasis added).

[67]    *See* ICA sections 1(5) and 13(1).  49 U.S.C. app. §§ 1(5) & 13(1) (1988).

shippers from pursuing full relief for payment of rates in excess of reasonable Index rate ceilings.  FERC failed to respond to Shipper Petitioners' argument on this issue because it erroneously determined its regulations *do* permit two Index factors to apply in a single Index Year.[68]  As this Court explained, "[a]n agency has not engaged in reasoned decision making if it 'entirely failed to consider an important aspect of the problem,' or if it did not 'engag[e] the arguments raised before it.'"[69]

When FERC radically departs from the import and meaning of its regulations, "under the guise of interpreting a regulation," the agency "create[s] de facto a new regulation" contrary to appropriate notice and comment rulemaking.[70]  When FERC adopts a rule, it is "bound by the rule until that rule is amended or revoked" and may not alter it "without notice and comment."[71]  FERC may change its interpretation of its regulations over time, but only where the regulation at issue is "genuinely ambiguous."[72]

---

[68]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 10 n.31, R.40- (J.A.1007).

[69]    *See Am. Pub. Gas*, 22 F.4th at 1025 (internal citations omitted).

[70]    *Newman v. FERC*, 27 F.4th at 697 (quoting *Christensen*, 529 U.S. at 588; *Chase Bank v. McCoy*, 562 U.S. at 211).

[71]    *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992)).

[72]    *Kisor*, 139 S. Ct. at 2415 (citing *Christensen*, 529 U.S. at 588; *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

There is no ambiguity in the regulations providing that the "index year is the period from July 1 to June 30,"[73] that a "carrier must compute the ceiling level for each index year by multiplying the previous index year's ceiling level by the most recent index published by the Commission,"[74] and that shippers may file complaints "alleg[ing] reasonable grounds for asserting that [a] rate violates the applicable ceiling level."[75] An Index Year is a 12-month period, and a single Index factor and related Index rate ceiling applies to each Index Year. If a pipeline's rates exceed such ceiling levels, shippers may file complaints and seek relief under the ICA.[76] There are no ambiguities for FERC to resolve and no gaps to fill.

FERC's action is irreconcilable with and violates FERC's existing regulations and ICA obligations because FERC's novel interpretation is not contemplated by the structure, text, or history of its regulations and it precludes shipper relief where they were charged, based on FERC's error, rates exceeding reasonable Index rate ceilings. Accordingly, the May 2022 Rehearing Order must be vacated and remanded. If, in the future, FERC believes it is necessary to attempt to preclude shippers from challenging rates in excess of Index ceiling levels deemed reasonable

---

[73]    18 C.F.R. § 342.3(c).

[74]    18 C.F.R. § 342.3(d)(1).

[75]    18 C.F.R. § 343.2(c)(1).

[76]    *Id.*

by FERC, it must first seek to modify these regulations via proper notice-and-comment rulemaking, which it has not done here.

FERC's "substantive rules are subject to the requirements of notice-and-comment rulemaking under the APA."[77]  Section 553 of the APA requires that when FERC institutes such a rulemaking it "provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully."[78]  That is, FERC's final rule must be a "logical outgrowth" of the proposed rule.[79]  FERC did not even propose a rulemaking in the orders on review, so it could not have revised the regulations at issue.  But even if it had, none of FERC's orders in this proceeding, including its Notice of Inquiry, put industry participants on notice of (i) any potential limits on shipper relief from paying rates in excess of Index ceilings deemed reasonable, or (ii) the establishment of multiple Index factors and Index rate ceilings within an Index Year.

In its Notice of Inquiry for the current five-year Index review, FERC recited the standard rule that "[m]ultiplying the rate ceiling effective on June 30 of the index year by the resulting number establishes the new Index rate ceiling for the year

---

[77]    *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (citing *Mendoza v. Perez*, 754 F.3d 1002, 1020-21 (D.C. Cir. 2014)).

[78]    *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988) (discussing 5 U.S.C. § 553).

[79]    *See CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1080 (D.C. Cir. 2009).

beginning the next day, July 1."[80]  It also repeatedly indicated that the Index factor

determined in this proceeding would apply to the five-year period "commencing July

1, 2021."[81]  The December 2020 Order did the same.[82]  Neither the Notice of Inquiry

nor the 2020 Order provided notice that FERC might depart from the plain text of

its regulations by implementing two separate Index factors and related Index rate

ceilings in a single Index Year, one deemed to be unreasonable and one deemed to

be reasonable, and then preclude shippers from seeking relief for being charged

Index ceiling rates deemed unreasonable.  As such, proper notice and the ability to

comment was required to (i) propose limiting shipper relief in this way and (ii)

demonstrate how the same comports with the fundamental requirements of the ICA,

FERC's obligations thereunder, and the unambiguous regulations.  FERC failed to

conform to these mandatory procedures, and its order is therefore contrary to law.

### 3.   FERC's Decision to Preclude Shippers from Seeking Relief from Being Charged Rates Exceeding Index Ceilings Deemed Reasonable Violates Statutory Requirements and Deviates Without Basis from Established Precedent

Even if FERC's novel interpretation of its Indexing regulations were to be

given credence, its decision to foreclose shippers' ability to seek relief from being

---

[80]     Notice of Inquiry, 171 FERC ¶ 61,239 at P 1 n.4, R.2-(J.A.15) (citing 18 C.F.R. § 342.3(d)(2)).

[81]     *Id.* at PP 7-8, R.2-(J.A.20).

[82]     December 2020 Order, 173 FERC ¶ 61,245 at PP 6, 9, 63, Ordering Paragraph, R.19-(J.A.744-47, J.A.788-89).

charged rates exceeding what FERC itself deemed to be reasonable Index rate ceilings reflects an unreasonable balancing of the relevant equities that is antithetical to FERC's responsibilities under the ICA.  FERC does not dispute that the Index rate ceilings made effective on July 1, 2021, pursuant to the 2020 Order, were the product of a flawed and erroneous order.  That order was corrected by FERC's January 2022 Rehearing Order setting forth a new, lower Index factor and requiring carriers to lower their Index rate ceilings and corresponding rates by March 1, 2022.

Nor can it be disputed that the Index rate ceilings, and corresponding rates, in effect for the period July 1, 2021 through February 28, 2022 were not final rates because Shipper Petitioners and others timely sought rehearing of the 2020 Order, putting all interested parties and participants on notice that the Index rate ceilings and corresponding rates could be modified upon review.  Finally, absent the opportunity to seek relief for being charged rates in excess of reasonable Index rate ceilings, shippers will be harmed and carriers will unreasonably benefit from FERC's 2020 Order, even though FERC reversed that order on rehearing for being flawed and erroneous.

FERC's failure to allow shippers the opportunity to recoup such undue windfalls to carriers and thus put shippers in the same position they would have been in but for FERC's error flies in the face of its precedent as well as its obligations and responsibilities under the ICA.

27

a.    **Precedent Dictates that Placing Shippers in the Same Position They Would Have Been in but for an Agency's Error is the Norm Absent Extraordinary Circumstances**

As the Supreme Court found, it is appropriate to return the benefits obtained from an order that never became final and that was reversed upon review. "An agency, like a court, can undo what is wrongfully done by virtue of its order."[83] Here, FERC's decision to arbitrarily preclude shippers from seeking return of benefits wrongfully obtained by carriers as a result of FERC's erroneous 2020 Order is a clear abuse of discretion and inconsistent with the public interest. Shipper Petitioners paid rates in excess of Index rate ceilings deemed reasonable for the period July 1, 2021 through February 28, 2022. To be placed in the same position they would have been but for FERC's error, Shipper Petitioners must have the opportunity to seek relief for their payment of rates exceeding appropriate Index rate ceilings.

Barring shippers from seeking relief from unjust and unreasonable rates is directly contrary to the purpose and intent of the ICA and FERC's obligations thereunder. The ICA was designed to protect shippers from unjust and unreasonable

---

[83]    *United Gas Imp. Co. v. Callery Props., Inc.*, 382 U.S. 223, 229-30 (1965).

28

rates, as well as from discriminatory and preferential actions.[84]  As found in the context of FERC's similar obligations and responsibilities under the Natural Gas Act, if the intent and purpose of FERC's applicable governing statute "is not arbitrarily to be defeated by uncorrected Commission error, the [injured party] *must be put in the same position that it would have occupied had the error not been made*."[85]  Moreover, as found in *Public Service Co. of Colorado v. FERC*, "Absent detrimental and reasonable reliance, anything short of full retroactivity . . . allows [some parties] to keep some unlawful overcharges without any justification at all."[86]  This Court "strongly resists [an] implication that the Congress intended to grant the agency the discretion to allow so capricious a thing."[87]  Here, FERC's denial of full retroactive relief for Shipper Petitioners fails any threshold for reasoned and/or rational decisionmaking.

---

[84]    *Suncor Energy Mktg. Inc. v. Platte Pipe Line Co.*, 132 FERC ¶ 61,242, at P 107 (2010) ("the purpose of the ICA is to protect shippers"); *Platte Pipe Line Co.*, 117 FERC ¶ 61,296, at P 63 (2006); *Farmers Union II*, 734 F.2d at 1501.

[85]    *Tenn. Valley Mun. Gas Ass'n v. FPC*, 470 F.2d 446, 452 (D.C. Cir.1972) (emphasis added).

[86]    91 F.3d 1478, 1490 (D.C. Cir. 1996).

[87]    *Exxon v. FERC*, 182 F.3d at 47 (quoting *Colorado PSC v. FERC*, 91 F.3d at 1490).

### b.    FERC's Bases for Denying Shippers Their Requested Relief Are Irreconcilable with Its Governing Statutes

FERC asserts that allowing shippers to seek relief from previously charged Index ceiling rates deemed unreasonable would be inconsistent with EPAct 1992 "[i]n light of the goals of simplified and streamlined ratemaking."[88]  FERC contends this type of remedy "could be burdensome," resulting in multiple complaints against multiple pipelines.[89]  FERC's contention is both illogical and founded on irrelevant speculation.

FERC ignores the fact that the ICA makes unlawful all unreasonable rates without exception.[90]  EPAct 1992 did not overturn or otherwise amend or modify the ICA.  As FERC made plain in Order 561, its Indexing mechanism was designed to conform with the ICA, including Section 1(5)'s rate reasonableness requirements and other sections requiring FERC to rectify any use of unreasonable rates.[91]

In Order 561-A, FERC explained that its Indexing regime comports with the requirement of ICA section 15(7) that its Indexing regime yield just and reasonable

---

[88]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 9 & n.29, R.40-(J.A.1106-07).

[89]    *Id.*, R.40-(J.A.1106-07).

[90]    ICA section 1(5), 49 U.S.C. app. § 1(5) (1988).

[91]    *See* Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,947-49.

results.[92]  FERC further detailed that requiring pipelines to reduce rates exceeding appropriate Index ceiling levels reflects the rebuttable finding that such rates are unjust and unreasonable and must be "adjusted to lawful levels."[93]

Contrary to FERC's assertions that the May 2022 Rehearing Order is consistent with EPAct 1992, its refusal to place shippers in the same position they would have been in but for its error and, instead, give effect to an Index factor and related Index ceiling rates deemed unreasonable and in violation of the ICA directly undermines Congress's intent for EPAct 1992 to support the just and reasonable rate requirements of the ICA and for shippers to be able to seek relief from such inappropriate rates.  This is especially the case when such unreasonable rates were the result of a FERC error and could only be considered provisional as all participants were on notice the subject Index factor and related Index rate ceilings were subject to future modification in light of pending rehearing requests.

FERC's claim that allowing Shipper Petitioners to seek relief from being charged unreasonable rates "could be burdensome" is beyond the pale.  At the outset, Shipper Petitioners are the only participants to express interest in seeking such relief. Moreover, of the referenced 83 pipelines[94] that filed to reduce their Index ceiling

---

[92]    Order 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,101 (discussing 49 U.S.C. app. § 15(7) (1988)).

[93]    *Id.*

[94]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 9 n.29, R.40-(J.A.1107).

rates following the January 2022 Rehearing Order, Shipper Petitioners ship on a fraction of the referenced carriers. In short, it is unknowable how many complaints may be filed against how many pipelines, and it is utter speculation for FERC to contend that the agency would be unduly burdened by enforcing its responsibilities and obligations under its governing statute.

Indeed, FERC's claims of burden are hollow because it has the authority, as it has done in the past, to make the Revised Index factor and resulting adjusted Index ceiling rates associated with the January 2022 Rehearing Order retroactive to July 1, 2021 (i.e., the beginning of the applicable five-year Index period). In doing so, FERC could readily order the refund of any and all rates charged in excess of the reasonable Index rate ceilings without the filing of any complaints as the prior Index factor and related Index rate ceilings were provisional and subject to modification pending review. Such action would avoid any claimed burden brought about by individual complaints and would not be considered retroactive ratemaking as it would simply place all participants in the same position they would have been in but for FERC's erroneous determination in the 2020 Order. This type of remedial action would, in turn, comport with the agency's ICA obligations and deny carriers an undue windfall from the collection of unreasonable, non-final rates.[95]

---

[95]     *See Off. of Consumers' Couns., Ohio v. FERC*, 826 F.2d 1136, 1139 (D.C. Cir. 1987); *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791, 797 (D.C. Cir. 1990).

FERC seems to take issue with Shipper Petitioners' request to proceed on a case-by-case basis, versus some other unidentified "simplified and streamlined process" in seeking relief from charged rates in excess of reasonable Index rate ceilings.[96]  FERC's assertion is not only ambiguous, it arbitrarily ignores its own regulatory guidelines.  Shipper Petitioners sought clarification/rehearing to seek relief on a case-by-case basis to avoid any claim that they did not have an adequate interest in or were otherwise not sufficiently adversely affected by the inappropriate Index ceiling rates of all offending pipelines.[97]  Shipper Petitioners' case-by-case relief is focused on those carriers which specifically charged the individual Shipper Petitioners rates in excess of the Index ceiling rates found reasonable rather than all carriers.  Such action directly comports with Order 561's guidance for FERC to rely "upon the affected parties to bring challenges to rates."[98]

Finally, FERC's decision to preclude Shipper Petitioners from pursuing relief from unjust and unreasonable rates based on an alleged burden with processing complaints reflects an inappropriate abdication of its statutory responsibilities.  The goals of administrative efficiency do not free FERC from the requirement and responsibility to enforce the statutory mandate that carriers only charge just and

---

[96]      May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 13, R.40-(J.A.1110).

[97]      *See R. Gordon Gooch v. Colonial Pipeline Co.*, 142 FERC ¶ 61,220 (2013), *aff'd Gooch v. FERC*, Case No. 13-1148 (D.C. Cir. Apr. 29, 2014) (per curiam).

[98]      Order 561, FERC Stats. & Regs. ¶ 30,985, at 30,967.

reasonable rates.  This Court should strongly resist FERC's implication (which is without any citation to authority), that Congress, under the guise of EPAct 1992, intended to grant FERC discretion on whether to enforce the justness and reasonableness requirements of the ICA on administrative burden grounds.  Such an arbitrary and capricious position is entirely irreconcilable with the authority and responsibilities Congress required of FERC under the ICA.[99]

   **c.    FERC's May 2022 Rehearing Order Drastically Departs from Precedent Without Reasoned or Rational Justification**

FERC makes the fundamentally false and misleading contention that refusing to make its Revised Index factor effective on July 1, 2021, at the beginning of the Index Year, and, in turn, precluding Shipper Petitioners from seeking relief from being charged Index ceiling rates in excess of reasonable levels is consistent with past practice and precedent.[100]  Three cases demonstrate the erroneous nature of FERC's claims.

First, FERC addressed a nearly identical issue when it first promulgated its Indexing regulations.  While Orders 561 and 561-A were still pending review, SFPP, L.P. ("SFPP") filed its Indexed rates "under protest."[101]  SFPP "included a protective

---

[99]    *See Exxon v. FERC*, 182 F.3d at 47-50.

[100]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 9 & n.30, R.40-(J.A.1106-07).

[101]    *SFPP, L.P.*, 71 FERC ¶ 61,425, at 62,655 (1995).

provision in its tariff filing" in which it purported to preserve "all of its rights and remedies with respect to this tariff, including. . . the right to seek a surcharge on the rate, and/or the right to seek a retroactive change in the tariff to restore the prior rate level" to the extent Orders 561 and 561-A were modified on review.[102]    The Commission found this language to be "unnecessary" because the "filed rate doctrine does not prevent [FERC] from correcting its legal error" and it has the authority to allow remedies to recoup related damages.[103]

FERC found that carriers would be protected by being allowed to pursue retroactive relief in response to an *upward* adjustment of the Index upon court review.  FERC provided no indication that such relief would only be available to carriers if judicial review resulted in an increase to the appropriate Index ceiling levels.  If such retroactive relief was to be available to carriers, surely FERC intended for shippers to have equivalent opportunities to pursue recoupment associated with charged Index ceiling rates deemed unreasonable in response to a *decrease* to the Index factor following review.[104]

Second, in FERC's first five-year review of its Index factor and related Index rate ceilings in 2000, FERC faced a situation where its approved Index factor was

---

[102]    *Id.* at 62,655 & n.6.

[103]    *Id.* at 62,655.

[104]    *See* Order 561-A, FERC Stats. & Regs. ¶ 31,000, at 31,101; 18 C.F.R. § 343.2(c)(1).

remanded for further consideration. On remand, FERC modified its originally approved Index factor.[105] While FERC contends that its relief determination in the May 2022 Rehearing Order is consistent with this 2003 order,[106] the unambiguous facts demonstrate the opposite.

In FERC's 2003 Order on Remand, it increased the Index factor from PPI-FG-1% to PPI-FG (i.e., without the -1% differential).[107] This change benefited carriers by allowing them to increase their annual Index rate ceilings for the relevant five-year period by an additional 1% over that originally allowed under the Index factor of PPI-FG-1%. Because this correction resulted in "a slight increase in the maximum ceiling rate that may be charged," FERC found that "equities dictate that we should attempt to put the parties in the same position they would have been in had we adopted the PPI in our December 2000 order."[108]

In putting the parties in the same position but for its error, FERC adopted the pipeline industry's request for a one-time, retroactive adjustment that allowed for the industry's cumulative Index rate ceilings to reach the levels they would have had the PPI-FG Index factor been in place from the beginning of the five-year Index

---

[105]   *Five-Year Rev. of Oil Pipeline Pricing Index*, 102 FERC ¶ 61,195, at PP 2-11 (2003) ("2003 Remand Order").

[106]   May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 13, R.40-(J.A.1110).

[107]   2003 Remand Order, 102 FERC ¶ 61,195 at P 1.

[108]   *Id*. at P 31.

period (i.e., July 1, 2001).[109]  Appendix B to the 2003 Order on Remand detailed

how carriers were to retroactively implement and apply the revised Index factor and

compute the related Index rate ceilings.[110]  The revised Index factor of PPI-FG was

to be made effective retroactive to July 1, 2001.  In turn, carriers were directed to

apply the revised Index PPI-FG factor to their Index rate ceilings for the Index Years

July 1, 2000-June 30, 2001, July 1, 2001-June 30, 2002, and July 1, 2002-June 30,

2003.[111]

The 2003 Remand Order is fundamentally inconsistent with the May 2022

Rehearing Order.  The 2003 Remand Order, unlike the May 2022 Rehearing Order,

(i) attempted to place participants in the same position they would have been but for

FERC's error; (ii) applied the revised Index factor retroactively to the beginning of

each Index Year within the applicable five-year period resulting in new Index rate

ceilings for the entirety of each applicable Index Year; and (iii) did not give effect

to multiple Index factors or resulting Index rate ceilings within any Index Year.

FERC's assertion that "in the sole instance where the Commission revised the

index level initially adopted in a five-year review [i.e., the 2003 Remand Order], it

---

[109]    *See id.* at P 1; AOPL Comments on Remand at 5, *Five-Year Rev. of Oil Pipeline Pricing Index*, Docket No. RM00-11-000 (Feb. 12, 2003) (FERC Accession No. 20030212-5020).

[110]    2003 Remand Order, 102 FERC ¶ 61,195 at Appendix B.

[111]    *Id.*

awarded prospective-only relief,"[112] is a fundamental misstatement. As described, the 2003 Remand Order granted the carrier industry's request to apply the revised Index factor retroactively in order to compute revised Index rate ceilings in each affected Index Year.

To the extent FERC meant that it denied the pipelines the ability to recoup forgone revenues that they would have collected under the revised Index factor, FERC made no determination regarding this issue for the simple reason that it was not asked to do so. Even though the pipeline industry was placed on notice in the above-referenced 1995 SFPP order and in other contexts[113] that FERC had the authority to make participants whole for its errors, no pipeline requested any recoupment mechanism to make-up for the approximately 1% in higher rates it could have charged but for FERC's error. As such, it is inaccurate to imply that FERC disallowed a mechanism to recoup retroactively revenues that participants would have been entitled to under the revised Index factor.

---

[112]      May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 13, R.40-(J.A.1110).

[113]      *See, e.g.*, *La. Pub. Serv. Comm'n v. Entergy Corp.*, 132 FERC ¶ 61,133, at P 31 & n.62 (2010) (there is "no question that the Commission has a policy of granting full refunds to correct unjust and unreasonable rates.") (citing various cases), *remanded La. Pub. Serv. Comm'n v. FERC*, 772 F.3d 1297, 1303-04 (D.C. Cir. 2014) (finding FERC failed to explain its deviation from this policy).

While FERC contends that the 2003 Remand Order provided for a change to Index ceiling levels within the Index Year, FERC's comparison is inapt.[114]  In the 2003 Remand Order, FERC made the revised Index factor effective retroactive to the beginning of the first applicable Index Year and required carriers to compute revised Index rate ceilings forward through the 2002 Index Year (i.e., the period July 1, 2002-June 30, 2003).[115]  Each revised set of Index rate ceilings was to be effective July 1 of each Index Year.[116]

While FERC directed carriers to file a tariff during the 2002 Index Year (i.e., July 1, 2002-June 30, 2003) to make the new Index rate ceilings and related rates effective as of approximately March-May 2003, FERC allowed, contrary to the May 2022 Rehearing Order, only one Index factor (i.e., the revised Index factor of PPI-FG) to be applied in each applicable Index Year and the revised Index rate ceilings were also to be effective for the entire Index Year beginning July 1, including the 2002 Index Year.[117]  While FERC attempts to make much of the mid-Index Year filings in this proceeding, its argument is hollow.  FERC did not preclude the pipeline industry from applying the plain language of the regulations and

---

[114]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 9 & n.30, R.40-(J.A.1106-07).

[115]    2003 Remand Order, 102 FERC ¶ 61,195 at Appendix B.

[116]    *Id.*

[117]    *Id.*

implementing an Index rate increase effective for the entire Index Year. The mid-year tariff filing did nothing more than formally publish, in tariff form, the Index ceiling rates made effective July 1 of the Index Year under the revised Index factor.[118]

Unlike the 2003 Remand Order, the May 2022 Rehearing Order "made the revised ceiling levels effective March 1, 2022, not July 1."[119] As a result, unlike the 2003 Remand Order, the May 2022 Rehearing Order improperly provides for two distinct Index factors and related Index rate ceilings within the single Index Year of July 1, 2021-June 30, 2022.

Finally, FERC arbitrarily ignores its decision issued only a few months prior to the May 2022 Rehearing Order. In response to the January 2022 Rehearing Order lowering the Index factor, pipelines filed revised tariffs specifying their recomputed Index rate ceilings based on the Revised Index factor and reducing rates to comply with the same. Similar to the *SFPP* proceeding, carriers sought to include language in these tariff filings reserving the right "to collect from shippers the positive difference, if any, between the rates resulting from application of the March 1 Index

---

[118]    *Id.*; ICA section 6(1), 49 U.S.C. app. § 6(1) (1988).

[119]    May 2022 Rehearing Order, 179 FERC ¶ 61,100 at P 8, R.40-(J.A.1106).

and the rates resulting from application of the new index, for all barrels shipped from March 1, 2022 forward."[120]

FERC rejected the carriers' reservation proposal, in relevant part, based on the fact that the proposals were one-sided and thus inequitable.[121] FERC faulted the carriers' proposals for not recognizing a "commensurate obligation for Pipelines to return any negative differences in rates to shippers if the index level is reduced."[122] FERC also faulted the carriers' proposals for failing to encompass the entire five-year period, especially the period July 1, 2021-March 1, 2022 "when pipelines benefitted from the higher index level adopted in the December 2020 Order."[123] Notwithstanding FERC's rejection of the applicable tariffs, it determined it would keep open the issue of "whether relief for the period beginning March 1, 2022 is appropriate on rehearing or following judicial review of the January 2022 Order."[124]

Shipper Petitioners submit that it is the height of arbitrary and capricious behavior when FERC (i) faults carriers for not accounting for shippers' potential recoupment of rates charged in excess of the reasonable Index factor and related Index rate ceilings for the period July 1, 2021-March 1, 2022 but (ii) rejects Shipper

---

[120]    *Energy Transfer GC NGL Pipelines LP*, 178 FERC ¶ 61,132, at P 5 (2022).

[121]    *Id*. at PP 10, 16.

[122]    *Id*. at 10.

[123]    *Id.*

[124]    *Id*. at P 12 n.27.

Petitioners' request for identical relief as inconsistent with FERC's regulations. Just as arbitrary and capricious is FERC's acknowledgement that it will keep open the option for carriers to be made whole for the period post-March 1, 2022 to the extent it is found FERC erred, but deny, without any reasoned basis, shippers the exact same opportunity to be made whole for the period prior to March 1 where FERC actually acknowledged and corrected its error.

## VII. CONCLUSION

Wherefore, Shipper Petitioners request that the Court vacate FERC's May 2022 Rehearing Order and remand FERC's January 2022 Rehearing Order with instructions for FERC to clarify that shippers are entitled to seek relief for excessive Index rates charged for the period July 1, 2021 through February 28, 2022.

Respectfully submitted,

 /s/ *Richard E. Powers, Jr.*      
Richard E. Powers, Jr.
Matthew D. Field
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4360
REPowers@venable.com
MField@venable.com

*Counsel for Airlines for America and National Propane Gas Association*

 /s/ *Steven A. Adducci*    
Steven A. Adducci
Gregory S. Wagner
William G. Bolgiano
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4361
SAAdducci@venable.com
GSWagner@venable.com
WGBolgiano@venable.com

*Counsel for Chevron Products Company, a division of Chevron U.S.A. Inc. and Valero Marketing and Supply Company*

January 11, 2023
July 6, 2023 (Final Brief)

43

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the 10,000 word limit set by the Court because it contains 9,827, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(2).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32(a)(1) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 14 point Times New Roman.

*/s/ Steven A. Adducci*
Steven A. Adducci
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4361
saadducci@venable.com

January 11, 2023
July 6, 2023 (Final Brief)

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on July 6, 2023. Participants in the case will be served by email through the Court's CM/ECF system.

*/s/ David A. Nosse*
David A. Nosse

# STATUTORY AND REGULATORY ADDENDUM

Excerpts Interstate Commerce Act,
49 U.S.C. app. § 1, *et seq.* (1988)……………………………………….……….Add-1

Sections 1801 to 1804 of the Energy Policy Act of 1992,
Pub. L. No. 102-486 § 1801, *et seq.* 106 Stat. 2776, 3010……………………Add-9

FERC Indexing Regulations and Related Procedural Rules,
18 C.F.R. §§ 342.3 & 343.2……………………………………………..………Add-13

<u>**Excerpts of the Interstate Commerce Act,**</u>
<u>**49 U.S.C. app. § 1, *et seq.* (1988)**</u>

## TITLE 49, APPENDIX—TRANSPORTATION

*This Appendix consists of sections of former Title 49 that were not included in Title 49 as enacted by Pub. L. 95-473 and Pub. L. 97-449, and certain laws related to transportation that were enacted after Pub. L. 95-473. Sections from former Title 49 retain the same section numbers in this Appendix. For disposition of all sections of former Title 49, see Table at beginning of Title 49, Transportation.*

| Chap. | | Sec. |
|---|---|---|
| 1. | Interstate Commerce Act, Part I; General Provisions and Railroad and Pipe Line Carriers | 1 |
| 2. | Legislation Supplementary to "Interstate Commerce Act" [Repealed, Transferred, or Omitted] | 41 |
| 3. | Termination of Federal Control [Repealed or Transferred] | 71 |
| 4. | Bills of Lading | 81 |
| 5. | Inland Waterways Transportation | 141 |
| 6. | Air Commerce | 171 |
| 7. | Coordination of Interstate Railroad Transportation [Repealed] | 250 |
| 8. | Interstate Commerce Act, Part II; Motor Carriers [Repealed or Transferred] | 301 |
| 9. | Civil Aeronautics [Repealed, Omitted, or Transferred] | 401 |
| 10. | Training of Civil Aircraft Pilots [Omitted or Repealed] | 751 |
| 11. | Seizure and Forfeiture of Carriers Transporting, etc., Contraband Articles | 781 |
| 12. | Interstate Commerce Act, Part III; Water Carriers [Repealed] | 901 |
| 13. | Interstate Commerce Act, Part IV; Freight Forwarders [Repealed] | 1001 |
| 14. | Federal Aid for Public Airport Development [Repealed or Transferred] | 1101 |
| 15. | International Aviation Facilities | 1151 |
| 16. | Development of Commercial Aircraft [Omitted] | 1181 |
| 17. | Medals of Honor for Acts of Heroism | 1201 |
| 18. | Airways Modernization [Repealed] | 1211 |
| 19. | Interstate Commerce Act, Part V; Loan Guaranties [Repealed] | 1231 |
| 20. | Federal Aviation Program | 1301 |
| 21. | Urban Mass Transportation | 1601 |
| 22. | High-Speed Ground Transportation [Omitted or Repealed] | 1631 |
| 23. | Department of Transportation | 1651 |
| 24. | Natural Gas Pipeline Safety | 1671 |
| 25. | Aviation Facilities Expansion and Improvement | 1701 |
| 26. | Hazardous Materials Transportation Control [Repealed] | 1761 |
| 27. | Hazardous Materials Transportation | 1801 |
| 28. | National Transportation Safety Board. | 1901 |
| 29. | Hazardous Liquid Pipeline Safety | 2001 |
| 30. | Abatement of Aviation Noise | 2101 |
| 31. | Airport and Airway Improvement | 2201 |
| 32. | Commercial Motor Vehicles | 2301 |
| 33. | Public Airports | 2401 |
| 34. | Motor Carrier Safety | 2501 |
| 35. | Commercial Space Launch | 2601 |
| 36. | Commercial Motor Vehicle Safety | 2701 |

## CHAPTER 1—INTERSTATE COMMERCE ACT, PART I; GENERAL PROVISIONS AND RAILROAD AND PIPE LINE CARRIERS

Sec.
1 to 23, 25. Repealed.
26. Safety appliances, methods, and systems.
    (a) "Railroad" defined.
    (b) Order to install systems, etc.; modification; negligence of railroad.
    (c) Filing report on rules, standards, and instructions; time; modification.
    (d) Inspection by Secretary of Transportation; personnel.
    (e) Unlawful use of system, etc.
    (f) Report of failure of system, etc., and accidents.
    (g) Repealed.
    (h) Penalties; enforcement.
26a to 27. Repealed.

§ 1. Repealed. Pub. L. 95-473, §4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470; Pub. L. 96-258, § 3(b), June 3, 1980, 94 Stat. 427

Section repealed subject to an exception related to transportation of oil by pipeline. Section 402 of Pub. L. 95-607, which amended par. (14) of this section by adding subdiv. (b) and redesignating existing subdiv. (b) as (c) subsequent to the repeal of this section by Pub. L. 95-473, was repealed by Pub. L. 96-258. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

§ 1. Regulation in general; car service; alteration of line

(1) Carriers subject to regulation

The provisions of this chapter shall apply to common carriers engaged in—

(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; or

(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or

(c) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102;

from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States.

**(2) Transportation subject to regulation**

The provisions of this chapter shall also apply to such transportation of ·passengers and property, but only insofar as such transportation takes place within the United States, but shall not apply—

(a) To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one· State and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter;

(b) Repealed. June 19, 1934, ch. 652, title VI, § 602(b), 48 Stat. 1102.

(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail·carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district.

**(3) Definitions**

(a) The term "common carrier" as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property. The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. The term "person" as used in this chapter includes an individual, firm, co-partnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof.

(b) For the purposes of sections 5, 12(1), 20, 304(a)(7), 310, 320, 904(b), 910, and 913 of this Appendix, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control.

(4) Duty to furnish transportation and establish through routes; division of joint rates

It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto; and it shall be the duty of common carriers by railroad subject to this chapter to establish reasonable through routes with common carriers by water subject to chapter 12 of this Appendix, and just and reasonable rates, fares, charges, and classifications applicable thereto. It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and.to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.

**(5) Just and reasonable charges; applicability; criteria for determination**

(a)·All charges made for any service rendered or to· be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. The provisions of this subdivision shall not. apply to common carriers by railroad subject to this chapter.

(b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this chapter shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful. No rate which contributes or which would contribute to the going concern value of such a carrier shall be found to be unjust or unreasonable, or not shown to be just and reasonable, on the ground that such rate is below a just or reasonable minimum for the service rendered or to be rendered. A rate which equals or exceeds the variable costs (as determined through formulas prescribed by the Commission) of providing a service shall be presumed, unless such presumption is rebutted by clear and convincing evidence, to contribute to the going concern value of the carrier or carriers proposing such rate (hereafter in this paragraph referred to as the "proponent carrier"). In determining variable costs, the Commission shall, at the request of the carrier proposing the rate, determine only those costs of the carrier proposing the rate and only those costs of the specific service in question, except where such specific data and cost information is not available. The Commission shall not include in variable cost any expenses which do not vary directly with the level of service provided under the rate in question. Notwithstanding any other provision of this chapter, no rate shall be found to be just and reasonable, or not shown to be just and reasonable, on the ground that such rate exceeds a just or reasonable maximum for the service rendered or to be rendered, unless the Commission has first found that the proponent carrier has market dominance over such service. A finding that a carrier has market dominance over a service shall not create a presumption that the rate or rates for such service exceed a just and reasonable maximum. Nothing in this paragraph shall prohibit a rate increase from a level which reduces the going concern value of the proponent carrier to a level which contributes to such going concern value and is otherwise just and reasonable. For the purposes of the preceding sentence, a rate increase which does not raise a rate above the incremental costs (as determined through formulas prescribed by the Commission) of rendering the service to which such rate applies shall be presumed to be just and reasonable.

(c) As used in this chapter, the terms—
(i) "market dominance" refers to an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies; and
(ii) "rate" means any rate or charge for the transportation of persons or property.

(d) Within 240 days after February 5, 1976, the Commission shall establish, by rule, standards and procedures for determining, in accordance with section 15(9) of this Appendix, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay. The Commission shall solicit and consider the recommendations of the Attorney General and of the Federal Trade Commission in the course of establishing such rules.

#### (5½) Exchange of services

Nothing in this Act shall be construed to prevent any common carrier subject to this Act from entering into or operating under any contract with any telephone, telegraph, or cable company, for the exchange of their services.

#### (6) Classification of property for transportation; regulations and practices; demurrage charges

It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.

#### (7) Free transportation for passengers prohibited; exceptions; penalty

No common carrier subject to the provisions of this chapter, shall, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees, its officers, time inspectors, surgeons, physicians, and attorneys at law, and the families of any of the foregoing; to the executive officers, general chairmen and counsel of employees' organizations when such organizations are authorized and designated to represent employees in accordance with the provisions of the Railway Labor Act [45 U.S.C. 151 et seq.]; to ministers of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute and homeless persons, and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Homes, including those about to enter and those returning home after discharge; to necessary caretakers of livestock, poultry, milk, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to railway mail-service employees and persons in charge of the mails when on duty and traveling to and from duty, and all duly accredited agents and officers of the United States Postal Service and the Railway Mail Service and post-office inspectors while traveling on official business, upon the exhibition of their credentials; to customs inspectors, and immigration officers; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks and physicians and nurses attending such persons: *Provided,* That this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation: *And provided further,* That this provision shall not be construed to prohibit the privilege of passes or franks, or the exchange thereof with each other, for the officers, agents, employees, and their families of such telegraph, telephone, and cable lines, and the officers, agents, employees and their families of other common carriers subject to the provisions of this chapter: *Provided further,* That the term "employees" as used in this paragraph shall include furloughed, pensioned, and superannuated employees, persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier and exemployees traveling for the purpose of entering the service of any such common carrier; and the term "families" as used in this paragraph shall include the families of those persons named in this proviso, also the families of persons killed, and the widows during widowhood and minor children during minority of persons who died, while in the service of any such common carrier. Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than $100 nor more than $2,000, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass, or free transportation shall be subject to a like penalty. Jurisdiction of offenses under this provision shall be the same as that provided for offenses in sections 41 to 43 of this Appendix.

#### (8) Transportation of commodity manufactured or produced by railroad forbidden

It shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier.

#### (9) Switch connections and tracks

Any common carrier subject to the provisions of this chapter, upon application of any lateral, branch line of railroad, or of any shipper tendering interstate traffic for transportation, shall construct, maintain, and operate upon reasonable terms a switch connection with any such lateral, branch line of railroad, or private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of the same; and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper. If any common carrier shall fail to install and operate any such switch or connection as aforesaid, on

Add-4

rate, or charge docketed with such organization within 120 days after such proposal is docketed.

(Feb. 4, 1887, ch. 104, part I, § 5b, as added Feb. 5, 1976, Pub. L. 94-210, title II, § 208(b), 90 Stat. 42, and amended Oct. 19, 1976, Pub. L. 94-555, title II, § 220(k), 90 Stat. 2630.)

## § 6. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

### § 6. Schedules and statements of rates, etc., joint rail and water transportation

**(1) Schedule of rates, fares, and charges; filing and posting**

Every common carrier subject to the provisions of this chapter shall file with the Commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares, and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this chapter.

**(2) Schedule of rates through foreign country**

Any common carrier subject to the provisions of this chapter receiving freight in the United States to be carried through a foreign country to any place in the United States shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates established and charged by such common carrier to all points in the United States beyond the foreign country to which it accepts freight for shipment; and any freight shipped from the United States through a foreign country into the United States the through rate on which shall not have been made public, as required by this chapter, shall, before it is admitted into the United States from said foreign country, be subject to customs duties as if said freight were of foreign production.

**(3) Change in rates, fares, etc.; notice required; simplification of schedules**

No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and

to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions: *Provided further,* That the Commission is authorized to make suitable rules and regulations for the simplification of schedules of rates, fares, charges, and classifications and to permit in such rules and regulations the filing of an amendment of or change in any rate, fare, charge, or classification without filing complete schedules covering rates, fares, charges, or classifications not changed if, in its judgment, not inconsistent with the public interest.

**(4) Joint tariffs**

The names of the several carriers which are parties to any joint tariff shall be specified therein, and each of the parties thereto, other than the one filing the same, shall file with the Commission such evidence of concurrence therein or acceptance thereof as may be required or approved by the Commission, and where such evidence of concurrence or acceptance is filed it shall not be necessary for the carriers filing the same to also file copies of the tariffs in which they are named as parties.

**(5) Copies of traffic contracts to be filed**

Every common carrier subject to this chapter shall also file with said Commission copies of all contracts, agreements, or arrangements, with other common carriers in relation to any traffic affected by the provisions of this chapter to which it may be a party: *Provided, however,* That the Commission, by regulations, may provide for exceptions from the requirements of this paragraph in the case of any class or classes of contracts, agreements, or arrangements, the filing of which, in its opinion, is not necessary in the public interest.

**(6) Form and manner of publishing, filing, and posting schedules; incorporation of rates into individual tariffs; time for incorporation; rejection of schedules; unlawful use**

The schedules required by this section to be filed shall be published, filed, and posted in such form and manner as the Commission by regulation shall prescribe. The Commission shall, beginning 2 years after February 5, 1976, require (a) that all rates shall be incorporated into the individual tariffs of each common carrier by railroad subject to this chapter or rail ratemaking association within 2 years after the initial publication of the rate, or within 2 years after a change in any rate is approved by the Commission, whichever is later, and (b) that any rate shall be null and void with respect to any such carrier or association which does not so incorporate such rate into its individual tariff. The Commission may, upon good cause shown, extend such period of time. Notice of any such extension and a statement of the reasons therefor shall be promptly transmitted to the Congress. The Commission is authorized to reject any schedule filed with it which is not in accordance with this section and with such regulations. Any schedule so rejected by the Commission shall be void and its use shall be unlawful.

**(7) Transportation without filing and publishing rates forbidden; rebates; privileges**

No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter,

by the Commission, and would serve a useful public purpose.

**(2) Attendance of witnesses and production of documents**

Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the Commission, or any party to a proceeding before the commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, and documents under the provisions of this section.

**(3) Compelling attendance and testimony of witnesses, etc.**

And any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any common carrier subject to the provisions of this chapter, or other person, issue an order requiring such common carrier or other person to appear before said Commission (and produce books and papers if so ordered) and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(4) Depositions**

The testimony of any witness may be taken, at the instance of a party, in any proceeding or investigation depending [pending] before the Commission, by deposition, at any time after a cause or proceeding is at issue on petition and answer. The Commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it, at any stage of such proceeding or investigation. Such depositions may be taken before any judge of any court of the United States, or any United States commissioner, or any clerk of a district court, or any chancellor, justice, or judge of a supreme or superior court, mayor or chief magistrate of a city, judge of a county court, or court of common pleas of any of the United States, or any notary public, not being of counsel or attorney to either of the parties, nor interested in the event of the proceeding or investigation. Reasonable notice must first be given in writing by the party or his attorney proposing to take such deposition to the opposite party or his attorney of record, as either may be nearest, which notice shall state the name of the witness and the time and place of the taking of his deposition. Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the Commission as hereinbefore provided.

**(5) Oath; subscription of testimony on deposition**

Every person deposing as herein provided shall be cautioned and sworn (or affirm, if he so request) to testify the whole truth, and shall be carefully examined. His testimony shall be reduced to writing by the magistrate taking the deposition, or under his direction, and shall, after it has been reduced to writing, be subscribed by the deponent.

**(6) Deposition in foreign country; filing of depositions**

If a witness whose testimony may be desired to be taken by deposition be in a foreign country, the deposition may be taken before an officer or person designated by the Commission, or agreed upon by the parties by stipulation in writing to be filed with the Commission. All depositions must be promptly filed with the Commission.

**(7) Fees for depositions**

Witnesses whose depositions are taken pursuant to this chapter, and the magistrate or other officer taking the same, shall severally be entitled to the same fees as are paid for like services in the courts of the United States.

(Feb. 4, 1887, ch. 104, pt. I, § 12, 24 Stat. 383; Mar. 2, 1889, ch. 382, § 3, 25 Stat. 858; Feb. 10, 1891, ch. 128, 26

Stat. 743; May 28, 1896, ch. 252, § 19, 29 Stat. 184; Mar. 3, 1911, ch. 231, § 291, 36 Stat. 1167; Feb. 28, 1920, ch. 91, § 415, 41 Stat. 484; Aug. 9, 1935, ch. 498, § 1, 49 Stat. 543; Sept. 18, 1940, ch. 722, title I, § 9(a), 54 Stat. 910; June 25, 1948, ch. 646, § 1, 62 Stat. 909; Feb. 5, 1976, Pub. L. 94–210, title II, § 207, 90 Stat. 42.)

## § 13. Repealed. Pub. L. 95–473, § 4(b), (c), Oct. 17, 1978, 92 Stat. 1466, 1470

Section repealed subject to an exception related to transportation of oil by pipeline. For disposition of this section in revised Title 49, Transportation, see Table at beginning of Title 49. See, also, notes following Table.

Prior to repeal, section read as follows:

**§ 13. Complaints to and investigations by Commission**

**(1) Complaint to Commission of violation of law by carrier; reparation; investigation**

Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper.

**(2) Complaints by State commissions; inquiry on Commission's own motion; expenses of State commissions**

Said Commission shall, in like manner and with the same authority and powers, investigate any complaint forwarded by the railroad commissioner or railroad commission or any State or Territory at the request of such commissioner or commission, and the Interstate Commerce Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made, to or before said Commission by any provision of this chapter, or concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter. And the said Commission shall have the same powers and authority to proceed with any inquiry instituted on its motion as though it had been appealed to by complaint or petition under any of the provisions of this chapter, including the power to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had excepting orders for the payment of money. No complaint shall at any time be dismissed because of the absence of direct damage to the complainant. Representatives of State commissions sitting with the Commission, under the provisions of this section, in cases pending before the Commission, shall receive such allowances for travel and subsistence expense as the Commission shall provide.

§ 15

(6) Commission to establishment just divisions of joint rates, fares, or charges; adjustments; procedures applicable

(a) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith. In so prescribing and determining the divisions of joint rates, fares, and charges, the Commission shall give due consideration, among other things, to the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare, or charge.

(b) Notwithstanding any other provision of law, the Commission shall, within 180 days after February 5, 1976, establish, by rule, standards and procedures for the conduct of proceedings for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise) in accordance with the provisions of this paragraph. The Commission shall issue a final order in all such proceedings within 270 days after the submission to the Commission of a case. If the Commission is unable to issue such a final order within such time, it shall issue a report to the Congress setting forth the reasons for such inability.

(c) All evidentiary proceedings conducted pursuant to this paragraph shall be completed, in a case brought upon a complaint, within 1 year following the filing of the complaint, or, in a case brought upon the Commission's initiative, within 2 years following the commencement of such proceeding, unless the Commission finds that such a proceeding must be extended to permit a fair and expeditious completion of the proceeding. If the Commission is unable to meet any such time requirement, it shall issue a report to the Congress setting forth the reasons for such inability.

(d) Whenever a proceeding for the adjustment of divisions of joint rates or fares (whether prescribed by the Commission or otherwise established) is commenced by the filing of a complaint with the Commission, the complaining carrier or carriers shall (i) attach thereto all of the evidence in support of their position, and (ii) during the course of such proceeding, file only rebuttal or reply evidence unless otherwise directed by order of the Commission. Upon receipt of a notice of intent to file a complaint pursuant to this paragraph, the Commission shall accord, to the party filing such notice, the same right to discovery that would be accorded to a party filing a complaint pursuant to this paragraph.

(7) Commission to determine lawfulness of new rates; suspension; refunds; nonapplicability to common carriers by railroad subject to chapter

Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period; but in case of a proposed increased rate or charge for or in respect to the transportation of property, the Commission may by order require the interested carrier or carriers to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, after September 18, 1940, the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible. This paragraph shall not apply to common carriers by railroad subject to this chapter.

(8) Commission to determine lawfulness of new rates; applicability to common carrier by railroad; suspensions; accounts; hearing and basis of decision

(a) Whenever a schedule is filed with the Commission by a common carrier by railroad stating a new individual or joint rate, fare, or charge, or a new individual or joint classification, regulation, or practice affecting a rate, fare, or charge, the Commission may, upon the complaint of an interested party or upon its own initiative, order a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice. The hearing may be conducted without answer or other formal pleading, but reasonable notice shall be provided to interested parties. Such hearing shall be completed and a final decision rendered by the Commission not later than 7 months after such rate, fare, charge, classification, regulation, or practice was scheduled to become effective, unless, prior to the expiration of such 7-month period, the Commission reports in writing to the Congress that it is unable to render a decision within such period, together with a full explanation of the reason for the delay. If such a report is made to the Congress, the final decision shall be made not later than 10 months after the date of the filing of such schedule. If the final decision of the Commission is not made within the applicable time period, the rate, fare, charge, classification, regulation, or practice shall go into effect

Add-7

§ 16. Orders of Commission and enforcement thereof

**(1) Award of damages**

If, after hearing on a complaint made as provided in section 13 of this Appendix, the Commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter for a violation thereof, the Commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named.

**(2) Proceedings in courts to enforce orders; costs; attorney's fee**

If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose benefit such order was made, may file in the district court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, or in any State court of general jurisdiction having jurisdiction of the parties, a complaint setting forth briefly the causes for which he claims damages, and the order of the Commission in the premises. Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the Commission shall be prima facie evidence of the facts therein stated, and except that the plaintiff shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal. If the plaintiff shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit.

**(3) Limitation of actions**

(a) All actions at law by carriers subject to this chapter for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after.

(b) All complaints against carriers subject to this chapter for the recovery of damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, subject to subdivision (d) of this paragraph.

(c) For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers subject to this chapter within three years from the time the cause of action accrues, and not after, subject to subdivision (d) of this paragraph, except that if claim for the overcharge has been presented in writing to the carrier within the three-year period of limitation said period shall be extended to include six months from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

(d) If on or before expiration of the two-year period of limitation in subdivision (b) of this paragraph or of the three-year period of limitation in subdivision (c) of this paragraph a carrier subject to this chapter begins action under subdivision (a) of this paragraph for recovery of charges in respect of the same transportation service, or, without beginning action, collects charges in respect of that service, said period of limitation shall be extended to include ninety days from the time such action is begun or such charges are collected by the carrier.

(e) The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after.

(f) A complaint for the enforcement of an order for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after.

(g) The term "overcharges" as used in this section shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Commission.

(h) The provisions of this paragraph shall extend to and embrace cases in which the cause of action accrued prior to June 7, 1924, as well as cases in which the cause of action accrues thereafter, except that actions at law begun or complaints filed with the Commission against carriers subject to this chapter for the recovery of overcharges where the cause of action accrued on or after March 1, 1920, shall not be deemed to be barred under subdivision (c) of this paragraph if such actions shall have been begun or complaints filed prior to June 7, 1924, or within six months thereafter.

(i) The provisions of this paragraph (3) shall extend to and embrace all transportation of property or passengers for or on behalf of the United States in connection with any action brought before the Commission or any court by or against carriers subject to this chapter: *Provided, however,* That with respect to such transportation of property or passengers for or on behalf of the United States, the periods of limitation herein provided shall be extended to include three years from the date of (A) payment of charges for the transportation involved, or (B) subsequent refund for overpayment of such charges, or (C) deduction made under section 66 of this Appendix, whichever is later.

**(4) Joinder of parties; process; judgment**

In such suits all parties in whose favor the Commission may have made an award for damages by a single order may be joined as plaintiffs, and all of the carriers parties to such order awarding such damages may be joined as defendants, and such suit may be maintained by such joint plaintiffs and against such joint defendants in any district where any one of such joint plaintiffs could maintain such suit against any one of such joint defendants; and service of process against any one of such defendants as may not be found in the district where the suit is brought may be made in any district where such defendant carrier has its principal operating office. In case of such joint suit the recovery, if any, may be by judgment in favor of any one of such plaintiffs, against the defendant found to be liable to such plaintiff.

**(5) Service of order of Commission and notices of proceedings**

Every order of the Commission shall be forthwith served upon the designated agent of the carrier in the city of Washington or in such other manner as may be provided by law. In proceedings before the Commission involving the lawfulness of rates, fares, charges, classifications, or practices, service of notice upon an attorney in fact of a carrier who has filed a tariff or schedule in behalf of such carrier shall be deemed to be due and sufficient service upon the carrier, except where the carrier has designated an agent in the city of Washington, District of Columbia, upon whom service of notices and processes may be made, as provided in section 50 of this title: *Provided,* That in such proceedings service of notice of the suspension of a tariff or schedule upon an attorney in fact of a carrier who has filed said tariff or schedule in behalf of such carrier shall be deemed to be due and sufficient service upon the carrier, and service of notice of the suspension of a joint tariff or schedule upon a carrier which has filed said joint tariff or schedule to which another carrier is a party shall be deemed to be due and sufficient notice upon the several carriers parties thereto. Such service of notice may be made by mail to such attorney in fact or carrier at the address shown in the tariff or schedule.

**(6) Suspension or modification of orders**

The Commission shall be authorized to suspend or modify its orders upon such notice and in such manner as it shall deem proper.

Add-8

## Sections 1801 to 1804 of the Energy Policy Act of 1992, Pub. L. No. 102-486 § 1801, *et seq.* 106 Stat. 2776, 3010

42 USC 7122
note.

# TITLE XVIII—OIL PIPELINE REGULATORY REFORM

**SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.**

(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act, the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act.

(b) EFFECTIVE DATE.—The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

**SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.**

(a) RULEMAKING.—Not later than 18 months after the date of the enactment of this Act, the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

(b) SCOPE OF RULEMAKING.—Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

(2) Qualification for standing (including definitions of economic interest) of parties who protest oil pipeline tariff filings or file complaints thereto.

(3) The level of specificity required for a protest or complaint and guidelines for Commission action on the portion of the tariff or rate filing subject to protest or complaint.

(4) An opportunity for the oil pipeline to file a response for the record to an initial protest or complaint.

(5) Identification of specific circumstances under which Commission staff may initiate a protest.

(c) ADDITIONAL PROCEDURAL CHANGES.—In conducting the rulemaking proceeding to carry out subsection (a), the Commission shall identify and transmit to Congress any other procedural changes relating to oil pipeline rates which the Commission determines are necessary to avoid unnecessary regulatory costs and delays and for which additional legislative authority may be necessary.

(d) WITHDRAWAL OF TARIFFS AND COMPLAINTS.—

(1) WITHDRAWAL OF TARIFFS.—If an oil pipeline tariff which is filed under part I of the Interstate Commerce Act and which is subject to investigation is withdrawn—

(A) any proceeding with respect to such tariff shall be terminated;

(B) the previous tariff rate shall be reinstated; and

(C) any amounts collected under the withdrawn tariff rate which are in excess of the previous tariff rate shall be refunded.

(2) WITHDRAWAL OF COMPLAINTS.—If a complaint which is filed under section 13 of the Interstate Commerce Act with

respect to an oil pipeline tariff is withdrawn, any proceeding with respect to such complaint shall be terminated.

(e) ALTERNATIVE DISPUTE RESOLUTION.—To the maximum extent practicable, the Commission shall establish appropriate alternative dispute resolution procedures, including required negotiations and voluntary arbitration, early in an oil pipeline rate proceeding as a method preferable to adjudication in resolving disputes relating to the rate. Any proposed rates derived from implementation of such procedures shall be considered by the Commission on an expedited basis for approval.

**SEC. 1803. PROTECTION OF CERTAIN EXISTING RATES.**

(a) RATES DEEMED JUST AND REASONABLE.—Except as provided in subsection (b)—

(1) any rate in effect for the 365-day period ending on the date of the enactment of this Act shall be deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act); and

(2) any rate in effect on the 365th day preceding the date of such enactment shall be deemed to be just and reasonable (within the meaning of such section 1(5)) regardless of whether or not, with respect to such rate, a new rate has been filed with the Commission during such 365-day period;

if the rate in effect, as described in paragraph (1) or (2), has not been subject to protest, investigation, or complaint during such 365-day period.

(b) CHANGED CIRCUMSTANCES.—No person may file a complaint under section 13 of the Interstate Commerce Act against a rate deemed to be just and reasonable under subsection (a) unless—

(1) evidence is presented to the Commission which establishes that a substantial change has occurred after the date of the enactment of this Act—

(A) in the economic circumstances of the oil pipeline which were a basis for the rate; or

(B) in the nature of the services provided which were a basis for the rate; or

(2) the person filing the complaint was under a contractual prohibition against the filing of a complaint which was in effect on the date of enactment of this Act and had been in effect prior to January 1, 1991, provided that a complaint by a party bound by such prohibition is brought within 30 days after the expiration of such prohibition.

If the Commission determines pursuant to a proceeding instituted as a result of a complaint under section 13 of the Interstate Commerce Act that the rate is not just and reasonable, the rate shall not be deemed to be just and reasonable. Any tariff reduction or refunds that may result as an outcome of such a complaint shall be prospective from the date of the filing of the complaint.

(c) LIMITATION REGARDING UNDULY DISCRIMINATORY OR PREFERENTIAL TARIFFS.—Nothing in this section shall prohibit any aggrieved person from filing a complaint under section 13 or section 15(1) of the Interstate Commerce Act challenging any tariff provision as unduly discriminatory or unduly preferential.

**SEC. 1804. DEFINITIONS.**

For the purposes of this title, the following definitions apply:

(1) COMMISSION.—The term "Commission" means the Federal Energy Regulatory Commission and, unless the context

requires otherwise, includes the Oil Pipeline Board and any other office or component of the Commission to which the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)) are delegated.

"(2) OIL PIPELINE.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the term "oil pipeline" means any common carrier (within the meaning of the Interstate Commerce Act) which transports oil by pipeline subject to the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

"(B) EXCEPTION.—The term "oil pipeline" does not include the Trans-Alaska Pipeline authorized by the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1651 et seq.) or any pipeline delivering oil directly or indirectly to the Trans-Alaska Pipeline.

"(3) OIL.—The term "oil" has the same meaning as is given such term for purposes of the transfer of functions from the Interstate Commerce Commission to the Federal Energy Regulatory Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

"(4) RATE.—The term "rate" means all charges that an oil pipeline requires shippers to pay for transportation services.

# TITLE XIX—REVENUE PROVISIONS

**SEC. 1901. AMENDMENT OF 1986 CODE.**

Except as otherwise expressly provided, whenever in this title an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1986.

## Subtitle A—Energy Conservation and Production Incentives

**SEC. 1911. TREATMENT OF EMPLOYER-PROVIDED TRANSPORTATION BENEFITS.**

(a) EXCLUSION.—Subsection (a) of section 132 (relating to exclusion of certain fringe benefits) is amended by striking "or" at the end of paragraph (3), by striking the period at the end of paragraph (4) and inserting ", or", and by adding at the end thereof the following new paragraph:

"(5) qualified transportation fringe."

(b) QUALIFIED TRANSPORTATION FRINGE.—Section 132 is amended by redesignating subsections (f), (g), (h), (i), (j), and (k) as subsections (g), (h), (i), (j), (k), and (l), respectively, and by inserting after subsection (e) the following new subsection:

"(f) QUALIFIED TRANSPORTATION FRINGE.—

"(1) IN GENERAL.—For purposes of this section, the term 'qualified transportation fringe' means any of the following provided by an employer to an employee:

**<u>FERC Indexing Regulations and Related Procedural Rules,</u>**
**<u>18 C.F.R. §§ 342.3 & 343.2</u>**

**Federal Energy Regulatory Commission**    **§ 342.3**

(b) Must make any change in existing rates pursuant to §342.3 or §342.4, whichever is applicable, unless directed otherwise by the Commission.

**§ 342.2  Establishing initial rates.**

A carrier must justify an initial rate for new service by:

(a) Filing cost, revenue, and throughput data supporting such rate as required by part 346 of this chapter; or

(b) Filing a sworn affidavit that the rate is agreed to by at least one non-affiliated person who intends to use the service in question, *provided* that if a protest to the initial rate is filed, the carrier must comply with paragraph (a) of this section.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

**§ 342.3  Indexing.**

(a) *Rate changes.* A rate charged by a carrier may be changed, at any time, to a level which does not exceed the ceiling level established by paragraph (d) of this section, upon compliance with the applicable filing and notice requirements and with paragraph (b) of this section. A filing under this section proposing to change a rate that is under investigation and subject to refund, must take effect subject to refund.

(b) *Information required to be filed with rate changes.* The carrier must comply with Part 341 of this title. Carriers must specify in their letters of transmittal required in §341.2(c) of this chapter the rate schedule to be changed, the proposed new rate, the prior rate, the prior ceiling level, and the applicable ceiling level for the movement. No other rate information is required to accompany the proposed rate change.

(c) *Index year.* The index year is the period from July 1 to June 30.

(d) *Derivation of the ceiling level.* (1) A carrier must compute the ceiling level for each index year by multiplying the previous index year's ceiling level by the most recent index published by the Commission. The index will be published by the Commission prior to June 1 of each year.

(2) The index published by the Commission will be based on the change in the final Producer Price Index for Fin-

ished Goods (PPI-FG), seasonally adjusted, as published by the U.S. Department of Labor, Bureau of Labor Statistics, for the two calendar years immediately preceding the index year. The index will be calculated by dividing the PPI-FG for the calendar year immediately preceding the index year, by the previous calendar year's PPI-FG.

(3) A carrier must compute the ceiling level each index year without regard to the actual rates filed pursuant to this section. All carriers must round their ceiling levels each index year to the nearest hundredth of a cent.

(4) For purposes of computing the ceiling level for the period January 1, 1995 through June 30, 1995, a carrier must use the rate in effect on December 31, 1994 as the previous index year's ceiling level in the computation in paragraph (d)(1) of this section. If the rate in effect on December 31, 1994 is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order in lieu of the rate in effect on December 31, 1994.

(5) When an initial rate, or rate changed by a method other than indexing, takes effect during the index year, such rate will constitute the applicable ceiling level for that index year. If such rate is subsequently lowered by Commission order pursuant to the Interstate Commerce Act, the ceiling level based on such rate must be recomputed, in accordance with paragraph (d)(1) of this section, using the rate established by such Commission order as the ceiling level for the index year which includes the effective date of the rate established by such Commission order.

(e) *Rate decreases.* If the ceiling level computed pursuant to §342.3(d) is below the filed rate of a carrier, that rate must be reduced to bring it into compliance with the new ceiling level; provided, however, that a carrier is not required to reduce a rate below the level deemed just and reasonable under section 1803(a) of the Energy Policy Act of 1992, if such section applies to such rate or to any prior rate. The rate decrease must be accomplished by filing

953

a revised tariff publication with the Commission to be effective July 1 of the index year to which the reduced ceiling level applies.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994; 59 FR 59146, Nov. 16, 1994; Order 606, 64 FR 44405, Aug. 16, 1999; Order 650, 69 FR 53801, Sept. 3, 2004]

### § 342.4  Other rate changing methodologies.

(a) *Cost-of-service rates.* A carrier may change a rate pursuant to this section if it shows that there is a substantial divergence between the actual costs experienced by the carrier and the rate resulting from application of the index such that the rate at the ceiling level would preclude the carrier from being able to charge a just and reasonable rate within the meaning of the Interstate Commerce Act. A carrier must substantiate the costs incurred by filing the data required by part 346 of this chapter. A carrier that makes such a showing may change the rate in question, based upon the cost of providing the service covered by the rate, without regard to the applicable ceiling level under § 342.3.

(b) *Market-based rates.* A carrier may attempt to show that it lacks significant market power in the market in which it proposes to charge market-based rates. Until the carrier establishes that it lacks market power, these rates will be subject to the applicable ceiling level under § 342.3.

(c) *Settlement rates.* A carrier may change a rate without regard to the ceiling level under § 342.3 if the proposed change has been agreed to, in writing, by each person who, on the day of the filing of the proposed rate change, is using the service covered by the rate. A filing pursuant to this section must contain a verified statement by the carrier that the proposed rate change has been agreed to by all current shippers.

[Order 561, 58 FR 58779, Nov. 4, 1993, as amended at 59 FR 59146, Nov. 16, 1994]

## PART 343—PROCEDURAL RULES APPLICABLE TO OIL PIPELINE PROCEEDINGS

Sec.
343.0  Applicability.
343.1  Definitions.
343.2  Requirements for filing interventions, protests and complaints.
343.3  Filing of protests and responses.
343.4  Procedure on complaints.
343.5  Required negotiations.

AUTHORITY: 5 U.S.C. 571–583; 42 U.S.C. 7101–7352; 49 U.S.C. 60502; 49 App. U.S.C. 1-85.

SOURCE: Order 561, 58 FR 58780, Nov. 4, 1993, unless otherwise noted.

### § 343.0  Applicability.

(a) *General rule.* The Commission's Rules of Practice and Procedure in part 385 of this chapter will govern procedural matters in oil pipeline proceedings under part 342 of this chapter and under the Interstate Commerce Act, except to the extent specified in this part.

### § 343.1  Definitions.

For purposes of this part, the following definitions apply:

(a) *Complaint* means a filing challenging an existing rate or practice under section 13(1) of the Interstate Commerce Act.

(b) *Protest* means a filing, under section 15(7) of the Interstate Commerce Act, challenging a tariff publication.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 578, 60 FR 19505, Apr. 19, 1995]

### § 343.2  Requirements for filing interventions, protests and complaints.

(a) *Interventions.* Section 385.214 of this chapter applies to oil pipeline proceedings.

(b) *Standing to file protest.* Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with the protest, a verified statement that the protestor has a substantial economic interest in the tariff filing in question must be filed.

(c) *Other requirements for filing protests or complaints*—(1) *Rates established under § 342.3 of this chapter.* A protest or complaint filed against a rate proposed or

**Federal Energy Regulatory Commission**                                    **§ 343.5**

established pursuant to §342.3 of this chapter must allege reasonable grounds for asserting that the rate violates the applicable ceiling level, or that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable, or that the rate decrease is so substantially less than the actual cost decrease incurred by the carrier that the rate is unjust and unreasonable. In addition to meeting the requirements of the section, a complaint must also comply with all the requirements of §385.206, except §385.206(b)(1) and (2).

(2) *Rates established under §342.4(c) of this chapter.* A protest or complaint filed against a rate proposed or established under §342.4(c) of this chapter must allege reasonable grounds for asserting that the rate is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable. In addition to meeting the requirements of the section, a complaint must also comply with all the requirements of §385.206, except §385.206(b)(1) and (2).

(3) *Non-rate matters.* A protest or complaint filed against a carrier's operations or practices, other than rates, must allege reasonable grounds for asserting that the operations or practices violate a provision of the Interstate Commerce Act, or of the Commission's regulations. In addition to meeting the requirements of this section, a complaint must also comply with the requirements of §385.206.

(4) A protest or complaint that does not meet the requirements of paragraphs (c)(1), (c)(2), or (c)(3) of this section, whichever is applicable, will be dismissed.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 602, 64 FR 17097, Apr. 8, 1999; Order 606, 64 FR 44405, Aug. 16, 1999]

**§ 343.3  Filing of protests and responses.**

(a) *Protests.* Any protest pursuant to section 15(7) of the Interstate Commerce Act must be filed not later than 15 days after the filing of a tariff publication. If the carrier submits a separate rate letter with the filing, providing a telefax number and contact person, and requesting all protests to be telefaxed

to the carrier by a protestant, any protest must be so telefaxed to the pipeline at the time the protest is filed with the Commission. Only persons with a substantial economic interest in the tariff filing may file a protest to a tariff filing pursuant to the Interstate Commerce Act. Along with the protest, the protestant must file a verified statement which must contain a reasonably detailed description of the nature and substance of the protestant's substantial economic interest in the tariff filing.

(b) *Responses.* The carrier may file a response to a protest no later than 5 days from the filing of the protest.

(c) *Commission action.* Commission action, including any hearings or other proceedings, on a protest will be limited to the issues raised in such protest. If a filing is protested, before the effective date of the tariff publication or within 30 days of the tariff filing, whichever is later, the Commission will determine whether to suspend the tariff and initiate a formal investigation.

(d) *Termination of investigation.* Withdrawal of the protest, or protests, that caused the initiation of an investigation automatically terminates the investigation.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 561–A, 59 FR 40256, Aug. 8, 1994]

**§ 343.4  Procedure on complaints.**

(a) *Responses.* The carrier must file an answer to a complaint filed pursuant to section 13(1) of the Interstate Commerce Act within 20 days after the filing of the complaint in accordance with Rule 206.

(b) *Commission action.* Commission action, including any hearings or other proceedings, on a complaint will be limited to the issues raised in the complaint.

[Order 561, 58 FR 58780, Nov. 4, 1993, as amended by Order 602, 64 FR 17097, Apr. 8, 1999]

**§ 343.5  Required negotiations.**

The Commission or other decisional authority may require parties to enter into good faith negotiations to settle oil pipeline rate matters. The Commission will refer all protested rate filings

955

Add-16