ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-1045 (lead), 22-1103, 22-1104, 22-1105, 22-1110, 22-1257, 22-1258

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

LIQUID ENERGY PIPELINE ASSOCIATION, et al.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

**FINAL JOINT REPLY BRIEF FOR CARRIERS**

| | |
|---|---|
| Amy L. Hoff | Miguel A. Estrada |
| Elizabeth B. Kohlhausen | *Counsel of Record* |
| Charles F. Caldwell | Matthew S. Rozen |
| CBL ENERGY LAW PLLC | Aaron Smith |
| 1800 West Loop South, Suite 1680 | GIBSON, DUNN & CRUTCHER LLP |
| Houston, Texas  77027 | 1050 Connecticut Avenue, N.W. |
| (713) 357-6776 | Washington, D.C.  20036 |
| ahoff@cblenergylaw.com | (202) 955-8500 |
| | MEstrada@gibsondunn.com |
| *Counsel for Petitioners* | |
| *Buckeye Partners, L.P.; Colonial* | *Counsel for Petitioner* |
| *Pipeline Company; Energy Transfer* | *Liquid Energy Pipeline Association* |
| *LP; Enterprise Products Partners, L.P.;* | |
| *and Plains All American Pipeline, L.P.* | |

*Counsel For Petitioner-Intervenors Listed On Signature Page*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

GLOSSARY ............................................................................................ vi

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ...........................................................................................2

I.    The January 2022 Order Is Procedurally Improper .............................2

      A.    The Order Violated Notice-And-Comment Requirements ........2

      B.    FERC Unlawfully Tolled Its Rehearing Deadline ....................7

      C.    Revising The Index Level Midway Through The Five-Year Index Period Was Arbitrary And Capricious ..................11

      D.    Carriers' Procedural Arguments Are Properly Before This Court ..........................................................................11

II.    FERC Cannot Justify Its Treatment Of The 2018 Tax-Policy Change ..................................................................................14

      A.    FERC Fails To Reconcile Its Approach With Its Established Methodology ........................................................14

      B.    FERC's Use Of Indexing To Correct Supposed Past Rate Errors Is Unsupported ............................................................18

III.    FERC Arbitrarily Trimmed The Data Set To The Middle 50% ........21

CONCLUSION .....................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Action on Smoking & Health v. C.A.B.*,
713 F.2d 795 (D.C. Cir. 1983)................................................................12

*Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).................................8, 9, 12, 13

*AOPL v. FERC* ("*AOPL I*"),
83 F.3d 1424 (D.C. Cir. 1996)...................................................5, 6, 13

*AOPL v. FERC* ("*AOPL II*"),
281 F.3d 239 (D.C. Cir. 2002)...............................................................20

*AOPL v. FERC* ("*AOPL III*"),
876 F.3d 336 (D.C. Cir. 2017)...............................................15, 16, 17

*AT&T Corp. v. FCC*,
113 F.3d 225 (D.C. Cir. 1997)..................................................................6

*Atl. Richfield v. DOE*,
769 F.2d 771 (D.C. Cir. 1984)...............................................................13

*Bandimere v. SEC*,
844 F.3d 1168 (10th Cir. 2016)............................................................10

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017)......................................................................5

*Consumer Energy Council v. FERC*,
673 F.2d 425 (D.C. Cir. 1982)..................................................................5

*Cook v. Tullis*,
85 U.S. 332 (1874)..................................................................................10

*CSX Transp., Inc. v. STB*,
568 F.3d 236 (D.C. Cir. 2009)...............................................................13

*CSX Transp., Inc. v. STB*,
584 F.3d 1076 (D.C. Cir. 2009) (panel rehearing) .............................13

*DHS v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020)..............................................................7

*Edmond v. United States*,
520 U.S. 651 (1997)................................................................10

*FEC v. NRA Pol. Victory Fund*,
513 U.S. 88 (1994).................................................................10

*Fogo De Chao (Holdings) v. DHS*,
769 F.3d 1127 (D.C. Cir. 2014)...........................................21

*Globalstar v. FCC*,
564 F.3d 476 (D.C. Cir. 2009)................................................6

*In re Hennen*,
38 U.S. (13 Pet.) 230 (1839)....................................................9

*Hispanic Affairs Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018)...............................................12

*Kennecott Corp. v. EPA*,
684 F.2d 1007 (D.C. Cir. 1982)...............................................4

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)............................................................8

*Lopez v. FAA*,
318 F.3d 242 (D.C. Cir. 2003)................................................9

*Lucia v. SEC*,
138 S. Ct. 2044 (2018)............................................................9

*Martin v. FERC*,
199 F.3d 1370 (D.C. Cir. 2000).............................................13

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015)...............................................4

*N.J. Dep't of Env't Prot. v. EPA*,
626 F.2d 1038 (D.C. Cir. 1980)...............................................4

*Omnipoint Corp. v. FCC*,
    78 F.3d 620 (D.C. Cir. 1996) ................................................................. 13

*Roth v. DOJ*,
    642 F.3d 1161 (D.C. Cir. 2011) ............................................................. 11

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003) ............................................................ 5, 7

*Sugar Cane Growers v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................. 7

*SW Gen., Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015) ............................................................... 10

*Tesoro Alaska Co. v. FERC*,
    778 F.3d 1034 (D.C. Cir. 2015) ........................................................... 11

*Transmission Access Pol'y Study Grp. v. FERC*,
    225 F.3d 667 (D.C. Cir. 2000) ............................................................... 6

*United States v. Arthrex*,
    141 S. Ct. 1970 (2021) ......................................................................... 10

## STATUTES

5 U.S.C. § 553(c) .................................................................................... 4

5 U.S.C. § 553(d) .................................................................................... 4

5 U.S.C. § 553(d)(3) .............................................................................. 12

Energy Policy Act of 1992, Pub. L. No. 102-486 § 1801(a) (Oct. 24, 1992) ......... 12

## REGULATIONS

18 C.F.R. § 385.713(a)(1) ........................................................................ 4

18 C.F.R. § 385.713(d)(1) ...................................................................... 11

18 C.F.R. § 385.713(f) ......................................................................... 7, 10

**OTHER AUTHORITIES**

*Dominion Energy Mktg.*,
　145 FERC ¶ 61,109 (2013) ....................................................................20

*Five-Year Review of the Oil Pipeline Index*,
　133 FERC ¶ 61,228 (2010) ..............................................................17, 20

*Five-Year Review of the Oil Pipeline Index*,
　153 FERC ¶ 61,312 (2015) ..............................................................15, 22

*Inquiry Regarding the Commission's Policy for Recovery of Income Tax Costs*,
　162 FERC ¶ 61,227 (2018) ....................................................................21

Order 561,
　58 Fed. Reg. 58753 (1993) ..............................................................14, 19

Order 561-A,
　59 Fed. Reg. 40243 (1994) ..............................................................3, 5, 6

Order 571-A,
　60 Fed. Reg. 356 (1995) ..........................................................................3

Order 888-A,
　62 Fed. Reg. 12274 (1997) ......................................................................6

*Revisions to Page 700 of FERC Form No. 6*,
　148 FERC ¶ 61,235 (2014) ....................................................................21

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPAct | Energy Policy Act of 1992, Pub. L. No. 102-486 (Oct. 24, 1992) |
| FERC | Federal Energy Regulatory Commission |
| ICA | Interstate Commerce Act, 49 U.S.C. app. §§ 1-65a (1988) |
| JA | Joint Appendix |
| MLP | Master Limited Partnership |
| NGA | Natural Gas Act |

## SUMMARY OF ARGUMENT

FERC denies that its January 2022 Order broke new ground in "rehearing" FERC's 2020 Order—and lowering the oil pipeline index level—after the Commission's political composition changed, without a new notice-and-comment period, a year after the order was entered, and six months after it took effect. Yet neither FERC nor its Shipper allies identify *any* precedent for changing an index level through rehearing, nor any way to reconcile FERC's approach with the APA's notice-and-comment requirement, FERC's rehearing regulation, or the Appointments Clause. FERC also continues to ignore Carriers' reliance on the 2020 Order. FERC denied Carriers any meaningful chance to raise these objections, so it cannot evade review through exhaustion principles.

Meanwhile, FERC fails to defend the substantive premises underlying its 180-degree shift on the effect of its 2018 tax-policy change and its approach to data trimming. Indeed, FERC now concedes (at 64, 84)—contrary to the January 2022 Order's reasoning—that lowering the index was not necessary to correct a double recovery of income taxes or to achieve just and reasonable rates.

The January 2022 Order was thus procedurally unlawful and arbitrary and capricious. This Court should vacate it.

1

## ARGUMENT

### I.    The January 2022 Order Is Procedurally Improper

#### A.    The Order Violated Notice-And-Comment Requirements

FERC does not contest that index orders are rules subject to the APA's notice-and-comment requirement, but contends (at 35-47) that it satisfied that requirement by soliciting comments on the original proposal that resulted in the 2020 Order. According to FERC (at 42), the public should be on notice that its "iterative" approach to rulemaking "rehearing[s]" may result in a completely new rule years after the fact, without any meaningful new opportunity to comment on that new rule. That is not the law and, unsurprisingly, FERC provides no apposite case-law support for these assertions. Nor does FERC justify its disregard for the significant reliance and remedy issues created by the 2020 Order. Instead, FERC retreats to meritless forfeiture arguments, faulting the Carriers (remarkably) for lacking the clairvoyance to object in advance to the possibility that a new rule could issue upon rehearing that might violate the law. These arguments only confirm that FERC's decision to change index levels partway through the five-year index period—*after* the 2020 Order took effect—must be set aside in full.

*Before* Shippers sought rehearing—in the original 2020 comment period—the sole question was what index level to set initially. Carriers commented on *that* issue. FERC Br. 45-46. But it would have made no sense at that stage—before there was

even an index level to rehear—to comment on the folly of setting one index level and then changing it one year later despite the reliance and remedies issues involved.

FERC's suggestion (at 2) that Carriers should have somehow anticipated and preemptively addressed the possibility of rehearing because FERC has previously "updated the Index and modified these updates on rehearing" is fiction. *None* of FERC's four examples (at 39) modified the index level. Two (the 2010 Index Rehearing Order and Order 572-A) *denied* rehearing. The others changed *cost-of-service* rate-change procedures, tariff requirements, and confidentiality obligations—not any index level—and, with one minor exception (lengthening a filing period), did so *before* those provisions took effect. Order 561-A, 59 Fed. Reg. 40243, 40243, 40246 (1994); Order 571-A, 60 Fed. Reg. 356, 356-57 (1995). Until Shippers sought rehearing, Carriers had no reason to anticipate—much less comment on—the prospect that FERC would adopt one index level, put it into effect, and then change it one year later.

Nor did Carriers have any basis to raise these issues in their own rehearing requests. Carriers' requests merely sought to "correct minor errors," JA963, 1045-46—affecting the index by 0.06 percentage points, JA816—that FERC could have addressed before the 2020 Order took effect, without implicating the concerns raised by Shippers' more impactful request to completely revise FERC's methodology.

Carriers' right to "see[k] rehearing" through FERC's illegitimate rehearing process *after* the January 2022 Order was promulgated and took effect, FERC Br. 40, likewise does not excuse FERC from seeking comments *beforehand*. FERC's cases hold that a subsequent rehearing opportunity satisfies "due process" in an adjudication. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1327 (D.C. Cir. 2015). But the APA requires more in rulemaking. "[A]llow[ing] petitions for reconsideration is not an adequate substitute for an opportunity for notice and comment prior to promulgation." *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019 (D.C. Cir. 1982). The APA requires FERC to promulgate rules "*after*" notice-and-comment procedures, to address comments "in the rul[e]," and then to "publi[sh]" the rule "*before* its effective date" unless (unlike here) FERC finds "good cause." 5 U.S.C. § 553(c)-(d) (emphases added). Those steps do "not contemplat[e]" "*post hoc* comment," so the possibility of requesting further rehearing cannot "cur[e]" FERC's initial "failure to follow section 553's procedures." *N.J. Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1049-50 (D.C. Cir. 1980). Otherwise, FERC would be exempt from notice-and-comment procedures entirely, since FERC purports to allow rehearing of all rules. 18 C.F.R. § 385.713(a)(1).

Nor can FERC avoid these deficiencies by characterizing the 2020 and 2022 Orders as part of a single "iterative comment process" that "was not completed until

after the Commission ruled on the rehearing requests."  FERC Br. 40-42; *accord* Shipper-Intervenors Br. 2-3.  The mere pendency of a rehearing petition—one never timely acted upon, based on illegal "tolling"—is no excuse for one presidential administration to undo another's work at any time it finds convenient, without any public comment, after a rule has taken effect and the regulated community has relied on it.  Indeed, rehearing requests were also "pending" in *Sprint Corp. v. FCC*, 315 F.3d 369, 375 (D.C. Cir. 2003), and *Clean Air Council v. Pruitt*, 862 F.3d 1, 5 (D.C. Cir. 2017), but notice-and-comment procedures were required each time.  And *Consumer Energy Council v. FERC* expressly rejected the notion that FERC could "use the occasion of a petition for rehearing to make any substantive change whatsoever in a rule, without providing some notice and comment."  673 F.2d 425, 445 n.71 (D.C. Cir. 1982).[1]

FERC and Shippers, by contrast, cite *no* case allowing agencies to rehear rules without further notice-and-comment, let alone after they take effect.  In *AOPL v. FERC* ("*AOPL I*"), FERC provided notice-and-comment procedures, adopted an index level, then "requested further comments" on rehearing, Order 561-A, 59 Fed.

---

[1] Although *Sprint* involved "*sua sponte*" rehearing, FERC Br. 44, *Clean Air Council* (which FERC ignores) and *Consumer Energy Council* did not, and all three addressed the effects of rehearing petitions.  FERC distinguishes *Consumer Energy Council* (at 45) because additional "'notice and comment would have been useful'" there, but that is equally true here, *see infra* at 6-7.

Reg. at 40246, and ultimately *denied* rehearing on that issue, 83 F.3d 1424, 1432 (D.C. Cir. 1996).  This Court found the original notice adequate, *id.*, but never suggested—as FERC (at 35-36, 41) and Shippers (at 4) imply—that FERC could modify the index through rehearing without further notice-and-comment procedures. *Transmission Access Policy Study Group v. FERC* likewise rejected a notice-and-comment challenge to a rule provision (adopting a negligence standard), 225 F.3d 667, 729 (D.C. Cir. 2000), that was *not* reheard, *see* 62 Fed. Reg. 12274, 12347 (1997).  Though FERC modified *other* aspects of the rule through rehearing, those modifications were not challenged on notice-and-comment grounds.

FERC's remaining cases (at 41-42) recite inapposite propositions.  *Before* promulgating a final rule, agencies can "'adjust or abandon'" proposals in foreseeable ways without reopening comment.  FERC Br. 41; *accord* Shipper-Intervenors Br. 2.  And agencies can consider the existing record in reconsidering rules *if they also provide a new comment period*, as the FCC did in *Globalstar v. FCC*, 564 F.3d 476, 482 (D.C. Cir. 2009), and *AT&T Corp. v. FCC*, 113 F.3d 225 (D.C. Cir. 1997); *see Third Reconsideration Order*, 11 FCC Record 6835, 6839 (1996) (describing *AT&T* comment period).  What agencies cannot do is modify a rule after it is promulgated without further notice-and-comment procedures.

Finally, FERC is wrong (at 46) that its error did not "'prejudice'" Carriers. As an initial matter, a "showing of actual prejudice is not required" where an agency

fails to provide any additional comment period before rehearing. *Sprint*, 315 F.3d at 377. Regardless, Carriers have proved prejudice here. Carriers Opening Br. 23, 30-31. FERC cannot have "'given sufficient consideration'" to Carriers' reliance on the 2020 Order when Carriers "had no opportunity to present" those arguments. *Sprint*, 315 F.3d at 377. And Shipper-Intervenors are wrong (at 6) that their pending rehearing requests mean the 2020 Order could not "generate any reliance interest." FERC cannot reasonably expect regulated parties to forgo reliance on its rules indefinitely until FERC deigns to grant "rehearing," potentially years after the established deadline for acting on a petition. Carriers also reasonably relied on FERC's unbroken 30-year practice of *never* changing the index level on rehearing— much less on the unlawfully extended timeline here. Ultimately, however, whether reliance interests are reasonable is a question for "the agency in the first instance," not this Court. *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). FERC never answered that question, so Carriers' inability to "rais[e]" these "additional considerations" was not harmless. *Sugar Cane Growers v. Veneman*, 289 F.3d 89, 96-97 (D.C. Cir. 2002).

## B.     FERC Unlawfully Tolled Its Rehearing Deadline

FERC also lost the chance to grant rehearing when it failed to "ac[t] upon" Shippers' requests "within 30 days." 18 C.F.R. § 385.713(f). The requests were thus "denied" by operation of law. *Id*.

**1.** FERC claims it tolled the rehearing deadline. FERC Br. 47-53. But under *Allegheny Defense Project v. FERC*, which interpreted identical "ac[t] upon" language in the Natural Gas Act ("NGA"), 964 F.3d 1, 12-16 (D.C. Cir. 2020) (en banc), the regulation is not subject to tolling. To differentiate the NGA and FERC's rehearing regulation, FERC (at 49-51) and Shippers (at 9-11) cite FERC's regulation delegating authority to the Secretary, and other irrelevant NGA language. But those differences cannot be dispositive because the rehearing regulation was meant to track and align procedures under all FERC-implemented statutes. Carriers Opening Br. 26. The rehearing regulation was never meant to give FERC tolling power in Interstate Commerce Act ("ICA") cases that it lacked under the NGA. And FERC's delegation regulation was meant not to create new tolling authority, but only to allocate to the Secretary whatever authority FERC believed it had under then-existing case law that *Allegheny* overruled. *Id.*

FERC's tolling practice before *Allegheny* is similarly irrelevant. FERC Br. 51. *Allegheny* found that "practice" unpersuasive, 964 F.3d at 14-15, and pre-*Allegheny* practice does not speak to whether the regulation should be interpreted consistently with *Allegheny* to align the ICA with the NGA. The "Staff Presentation" FERC cites (at 50) likewise warrants no deference because it is not "the agency's 'authoritative' or 'official position,'" *Kisor v. Wilkie*, 139 S. Ct. 2400,

2416 (2019), and the regulation's pertinent language is "unambiguou[s]," *Allegheny*, 964 F.3d at 12.

Shippers alone argue (at 12) that FERC has inherent "'flexibility to adjust'" its own 30-day deadline. But that flexibility is limited to rules designed only to "benefi[t] the agency," not those that—like the deadline here, which ensures repose as to the rates Carriers may charge—"'confer important procedural benefits'" on regulated parties. *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

**2.** The Tolling Order was also invalid because the Deputy Secretary who issued it was not duly appointed as an Officer. FERC (at 54) casts him as a mere employee whose duties "tend" to be ministerial, claiming he "primarily" manages logistics and "largely" deals with recordkeeping. But these qualifiers tactility concede he has other non-ministerial duties—including issuing the tolling order here. Although the Deputy Secretary's ministerial duties—such as mechanically calculating the annual index adjustment, Shipper-Intervenors Br. 13—might not violate the Appointments Clause, neither do they make him an employee. *Lucia v. SEC*, 138 S. Ct. 2044, 2052 n.4 (2018). Clerks of courts, for example, also manage logistics and recordkeeping, yet they are inferior Officers. *In re Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839).

The Commission's theoretical "oversight" of the Deputy Secretary is likewise irrelevant. FERC Br. 54-55; *accord* Shipper-Intervenors Br. 12-13. No party

suggests the Commission directed the tolling order here.  And the mere *possibility* of "supervision" is "not unique to employees."  *Bandimere v. SEC*, 844 F.3d 1168, 1184 (10th Cir. 2016).  It is the defining characteristic of "inferior," as opposed to principal, Officers.  *Edmond v. United States*, 520 U.S. 651, 663 (1997); *United States v. Arthrex*, 141 S. Ct. 1970, 1981 (2021).

The January 2022 Order does not "cur[e]" the defect.  FERC Br. 56; *accord* Shipper-Intervenors Br. 13.  Under black-letter law, a principal cannot "ratif[y]" an untimely action after the deadline to act.  *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) (citing Restatement (Second) of Agency § 90).  Ratification is effective only when "the party ratifying" is "able" to "do the act ratified ... *at the time the ratification was made*."  *Id.* (quoting *Cook v. Tullis*, 85 U.S. 332, 338 (1874)).  As in *NRA*, FERC "could not ... have" tolled the rehearing deadline *after* it expired— and rehearing was denied by operation of law—so its purported ratification "came too late" to "be effective."  *Id.*[2]

These issues are far from academic.  FERC Br. 57; Shipper-Intervenors Br. 10.  Absent a valid tolling order, the rehearing process would have ended, 18 C.F.R. § 385.713(f), leaving the 2020 Order in place.  Even FERC does not dispute that a

---

[2]    FERC's cases applying the "de facto officer doctrine" are irrelevant because that doctrine does not "apply" to "Appointments Clause challenges."  *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 81 (D.C. Cir. 2015).

new notice-and-comment rulemaking would have been required to modify the rule at that point.

### C. Revising The Index Level Midway Through The Five-Year Index Period Was Arbitrary And Capricious

At a minimum, FERC departed from settled policy by voluntarily changing the index more than once in the same five-year period. But FERC failed to acknowledge and justify that change in practice or consider reliance on the 2020 Order. Carriers Opening Br. 29-31. By continuing to ignore these requirements, FERC has "forfeited" any response, *Roth v. DOJ*, 642 F.3d 1161, 1181 (D.C. Cir. 2011), beyond its meritless exhaustion defense, *see infra* at 11-14.

### D. Carriers' Procedural Arguments Are Properly Before This Court

FERC cannot shield these procedural violations from review by arguing (at 31) that Carriers failed to exhaust administrative remedies. Exhaustion is not required where, as here, "the petitioner had no opportunity to raise an issue until the agency issued its final rule." *Tesoro Alaska Co. v. FERC*, 778 F.3d 1034, 1041 n.7 (D.C. Cir. 2015). *Before* FERC promulgated the 2020 Order and anyone sought rehearing, objecting to FERC's procedures for rehearing in the abstract would have made no sense. And *after* Shippers sought rehearing, FERC barred Carriers from responding. 18 C.F.R. § 385.713(d)(1); *see* JA954.

FERC's suggestion (at 34) that Carriers should have raised procedural objections to Shippers' rehearing requests in Carriers' own limited rehearing

requests is similarly illogical. Carriers' requests never asked FERC to eschew notice-and-comment procedures or toll the rehearing deadline, and it was not Carriers' burden to spell out proper rehearing procedures. The "onus" to determine whether "notice and comment is unnecessary" is on the agency, *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983), and "[e]xhaustion" is "not a license for agency passivity" given that "'affirmative burden,'" *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C. Cir. 2018). Unlike Shippers, moreover, Carriers' requests sought only to "correct minor errors" in FERC's data source (JA963), not to challenge FERC's "ratemaking methodology," EPAct § 1801(a), so they did not trigger the same notice-and-comment concerns, particularly given the APA's "good cause" exception, 5 U.S.C. § 553(d)(3). Accordingly, nothing Carriers might have said about their own rehearing requests would have spoken to the procedures for Shippers' requests.

FERC's alternative argument—that Carriers should have raised their procedural objections by appealing the tolling order or seeking rehearing of that order or the January 2022 Order, FERC Br. 35, 47, 56; *accord* Shipper-Intervenors Br. 8 & n.30—is foreclosed. Tolling orders "are not final enough for aggrieved parties to seek relief in court." *Allegheny*, 964 F.3d at 10. Instead, Carriers' petitions for review properly encompass the "underlying" tolling order, as other "contemporaneous filings"—including Carriers' docketing statements—make clear.

*Martin v. FERC*, 199 F.3d 1370, 1372 (D.C. Cir. 2000). And the Hobbs Act—which governs judicial review here—"does not require a party to seek rehearing." *AOPL I*, 83 F.3d at 1432 n.14. A "court may not require a party to return to the agency to raise an issue that arises only at the final rulemaking." *CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1078-79 (D.C. Cir. 2009).

This Court initially adopted FERC's position in *CSX*—holding that exhaustion is required "[e]ven where" it "requires seeking reconsideration," 568 F.3d 236, 247 (D.C. Cir. 2009)—before rejecting that position on rehearing, 584 F.3d at 1078-79. As in *CSX*, Carriers "had no way to raise" their procedural objections "until the [agency] issued its final rule," and there is "no authority to require [them] to file a petition for rehearing" for purposes of "exhaust[ion]." *Id.* at 1079. Otherwise, FERC could "evade ... judicial review" indefinitely by putting an unlawful rule into effect, forcing aggrieved parties to seek rehearing, and delaying a decision while injuries mount—precisely what this Court rejected in *Allegheny*. 964 F.3d at 16.

Exhaustion is excused, moreover, where the agency is "'wedded'" to its view, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996), or the issue is "strictly … legal," *Atl. Richfield v. DOE*, 769 F.2d 771, 782 (D.C. Cir. 1984). FERC concedes (at 42, 51) that its positions on notice-and-comment and tolling are

entrenched, and Carriers' procedural and constitutional arguments are pure questions of law, so exhaustion is no defense.

## II.    FERC Cannot Justify Its Treatment Of The 2018 Tax-Policy Change

FERC's substantive defense of the January 2022 Order fares no better. FERC's purported "discretion" to decide how its 2018 tax-policy change should impact the index, FERC Br. 65, is subject to the APA's reasoned decisionmaking requirement, which FERC violated.

### A.    FERC Fails To Reconcile Its Approach With Its Established Methodology

FERC does not dispute that the APA requires it to acknowledge methodological changes, and it never did so here. Instead, FERC continues to deny that it changed methodologies. That is incorrect. FERC has never previously allowed a policy change to impact the index calculation, particularly where that change affects only a subset of the industry. Instead, to accurately identify the trend in cost inflation, FERC has always calculated the index based on actual cost changes "experienced by the oil pipeline industry," Order 561, 58 Fed. Reg. 58753, 58759 (1993), by comparing consistently measured data sets from the start and end of the relevant time period. Yet FERC now claims a policy change that dramatically affected the reported data for a minority of pipelines—but had no effect on the rest— should impact the index for the entire industry, and that using inconsistently

14

measured data between the start and end points of the relevant period is not only permissible but required.

FERC (at 61) and Shippers (at 14-16 & n.60) conflate this issue with the issue decided in the 2015 Index Order, 153 FERC ¶ 61,312, and resulting appeal, *AOPL v. FERC*, 876 F.3d 336 (D.C. Cir. 2017) ("*AOPL III*").  But the issues are distinct.

The issue in 2015 was which data source to use to calculate the index.  Instead of using accounting data and other proxies for pipelines' "actual" costs, FERC switched to Page 700 data—which FERC viewed as better reflecting costs "recoverable" under a cost-of-service methodology—and this Court affirmed. *AOPL III*, 876 F.3d at 345-46.  The issue now—whether the index should reflect *policy changes* that affect those data at only one end of the measured time period— is distinct.  Here, MLP-owned pipelines' income taxes were recoverable under a cost-of-service methodology (and reported on Page 700) at the start of the relevant five-year period (2014) but not the end (2019).  The 100% reduction in their reported tax costs resulted solely from FERC's 2018 tax-policy change—not from any real change in income-tax costs experienced by those pipelines.

FERC cites no instance before the January 2022 Order in which its cost-recovery policies affected the index or where it measured costs at the start and end of the index-calculation period with completely different measuring sticks.  In 2015, FERC's cost-recovery policies had not changed over the relevant period (2009-

2014).  JA750-51 n.29.  In that context, FERC's statement that the index "is meant to reflect changes to recoverable pipeline costs," 2015 Index Order at P 13, meant only that FERC should measure "'actual cost changes experienced by the oil pipeline industry'" within the categories of recoverable costs—that is, "'normal industry-wide cost-of-service changes,'" *AOPL III*, 876 F.3d at 345-46.  Neither the 2015 Index Order nor *AOPL III* suggests that a one-time policy change during the index period—affecting only a minority of pipelines, yet not actually impacting the costs experienced by those pipelines—constitutes a normal, industry-wide change in the actual cost of operating pipelines.

To the limited extent the 2015 Index Order considered cost-recovery policy changes, it reaffirmed—contrary to the January 2022 Order—that such changes should *not* affect the index because FERC would measure cost changes *using consistent policy assumptions*.  When pipelines expressed concerns that the index would be skewed if "a pipeline's page 700 ratemaking assumptions change" in the middle of an index review, FERC countered that pipelines were "obligated to note" such changes on their Page 700 data to avoid "distort[ing] the index calculation." 2015 Index Order at P 18.  This Court then relied on these assurances in upholding the switch to Page 700 data, citing FERC's claims that "established ratemaking practices" would ensure data "consistent enough to accurately calculate the index."

16

*AOPL III*, 876 F.3d at 345.  FERC's retreat from these critical assurances further undercuts the January 2022 Order.

FERC admits, moreover, that when the same issue—whether cost-recovery-policy changes should affect the index—arose squarely in the 2010 Index Order, FERC "did not directly incorporate" its 2005 tax-policy change into the index, contrary to its approach here.  FERC Br. 62.  Although the 2005 policy change *increased* partnership pipelines' recoverable income-tax costs, FERC never attempted to reflect that policy change as an "actual" cost change in the index calculations by increasing the index level concomitantly.  Carriers Opening Br. 34-35.  FERC continues (at 62) to blame that inconsistency on inadequacies in the available data.  But FERC never even attempted to capture the increase through the index.  Although FERC used proxies at the time to adjust the accounting data for other purposes, 2010 Index Order, 133 FERC ¶ 61,228 P 5, it never sought a proxy for the 2005 tax-policy change's effect, since doing so would have contradicted its longstanding methodology.

FERC also fails to offer any coherent justification for applying its 2018 tax-policy change to 2016 data but not 2014 data.  In 2018, FERC instructed pipelines to modify 2016 data that previously had been reported in 2017 Page 700 filings.  FERC's 2018 directive was precisely the sort of "counterfactua[l] manipulat[ion]" of previously reported data that the January 2022 Order found "inappropriat[e],"

17

Shipper-Intervenors Br. 16, so FERC's explanation (at 63) that it "applied the [2018 tax-policy] change only prospectively" rings hollow.  Further, FERC's disparate decisions in the 2018 and January 2022 orders meant that FERC set the *index level* by comparing *mismatched* 2014 and 2019 data, but decided challenges to pipelines' 2018 *annual index increases* by comparing *consistent* 2016 and 2017 data.  FERC's attempted distinction between prospective and retrospective application in no way justifies that discrepancy.

## B.    FERC's Use Of Indexing To Correct Supposed Past Rate Errors Is Unsupported

FERC does not defend the other express premise of its treatment of the tax-policy change—that FERC "must" reverse the 2020 Order to "eliminat[e]" MLP-owned pipelines' "double recovery" of income taxes and comply with the ICA's requirement of "just and reasonable" rates.  JA969-70.  Instead, it shifts positions in two ways.

*First*—effectively conceding error—FERC abandons the premise that the ICA *required* it to reverse the 2020 Order's approach to the tax-policy change.  FERC now denies (at 84) that it ever "declare[d] the rates established" under the 2020 Order "to be unjust and unreasonable."  If those rates were not unjust or unreasonable, however, then FERC's belief that it "must" lower the index level "to produce just and reasonable" rates was error.  JA969-70.

18

*Second*, FERC now claims its goal was to "'align pipelines' *future* rates with their *future* costs,'" not to "compensat[e] for prior-period over-recoveries." FERC Br. 64-65; *accord* Shipper-Intervenors Br. 16. But unlike cost-of-service ratemaking, indexing was never meant to perfectly "align" future rates and costs. Instead, it serves to simplify ratemaking by "preserv[ing] the value" of *existing* rates. Order 561, 58 Fed. Reg. at 58759. "[S]ome divergence" from recoverable costs "is inevitable." *Id*. at 58758. Lowering indexed rates to reflect the elimination of MLP-owned pipelines' income tax allowance does not *preserve* existing rates going forward because no further equivalent reduction is possible in the future. The allowance has already been reduced to zero, as FERC recognized. *See* JA973 n.51.

Nor has FERC explained how the January 2022 Order aligns future rates and costs. FERC's purported "finding" that MLP-owned pipelines were double recovering, FERC Br. 62, was not supported by substantial (or any) evidence, Carriers Opening Br. 39-41. The 2018 tax-policy change addressed double recovery in cost-of-service rates, not indexed rates, but the vast majority of pipelines use indexed rates. *Id.* And it is undisputed that non-MLP-owned pipelines—the majority of pipelines—were not double recovering. It is unclear how lowering all pipelines' rates by the amount of an unproven double recovery that most pipelines never experienced could possibly make any pipeline's future rates more accurate.

Finally, lowering the index for the entire pipeline industry is arbitrary and capricious when the purported problem (whether past or future) existed, at most, for only a small fraction of pipelines. Carriers Opening Br. 41-43. Carriers are not asking for "special treatment" of MLP pipelines. Shipper-Intervenors Br. 17 (citing FERC's 2010 rejection of "separate indices" for certain pipelines, 133 FERC ¶ 61,228 P 105). The point is that FERC's reduction of the uniformly applicable index level "too broad[ly]" compensated for any alleged double-recovery problem. *Dominion Energy Mktg.*, 145 FERC ¶ 61,109 P 14 n.17 (2013). Individual cost-of-service proceedings remain available to correct any double recoveries, and they are not "inconsistent" (FERC Br. 66) with EPAct's mandate for simplified ratemaking or with *AOPL v. FERC*, 281 F.3d 239 (D.C. Cir. 2002) ("*AOPL II*"). This Court rejected individual proceedings as a solution to "systemic errors" in FERC's index. *Id.* at 244. But FERC did the opposite here—adopt a *systemic remedy* for alleged (but unsubstantiated) *individualized errors* in some pipelines' rates. Cost-of-service proceedings are the standard solution for such "aberrant cases." *Id.*[3]

---

[3] FERC never explains its claim (at 65) that the 2020 Order improperly "eliminate[d]" the effect of the 2017 Tax Cuts and Jobs Act. The Act lowered income taxes for corporations, not partnerships, and any effect on taxes paid by MLP-owned pipelines' corporate unit holders *would* have been reflected in the 2020 Order's index level. The 2018 Income-Tax Policy eliminated MLP-owned pipelines' *double* recovery of income taxes in cost-of-service rates—once from taking an income-tax allowance, and once from FERC's separate return-on-equity policy—but preserved MLP-owned pipelines' *single* recovery of tax costs through

### III.    FERC Arbitrarily Trimmed The Data Set To The Middle 50%

FERC defends its decision to use the middle 50% rather than middle 80% of pipeline data primarily by deflecting from the main factual error underlying its decision, Carriers Opening Br. 43-45, and instead offering "other evidence" and justifications to support using the middle 50%, FERC Br. 68-73; *accord* Shipper-Intervenors Br. 20-21.  But FERC's factual error was integral to its reasoning.  FERC followed the 2015 Order's data-trimming approach because it found the 2020 and 2015 index records were not "distinguishable." JA1000.  Although there were fewer demonstrated outliers between the middle 50% and 80% in 2020 than in 2015, FERC emphatically denied that fact in its concluding paragraph on trimming.  JA1007.  FERC's prominent "reliance" on that incorrect premise "preclude[s]" FERC's suggestion (at 73-75) that it would have reached the "same" data-trimming decision "absent" its error.  *Fogo De Chao (Holdings) v. DHS*, 769 F.3d 1127, 1149 (D.C. Cir. 2014).

FERC does not dispute that more anomalies were identified in the 2015 data than in the 2020 data.  FERC Br. 72-73.  FERC dismisses this evidence as

---

return on equity.  162 FERC ¶ 61,227 PP 8-9 (2018).  Thus, any tax reduction for MLP-owned pipelines' corporate unit holders would have reduced the returns on equity required to attract investment for MLP-owned pipelines, *see id.* at PP 9, 30 n.54, and MLP-owned pipelines would have reported these lower returns in the Page 700 data that was used to calculate the index level, *see Revisions to Page 700*, 148 FERC ¶ 61,235 P 3 (2014).

inconclusive—the product of shippers submitting more "detailed" analysis in 2015, not proof that more anomalies existed. *Id*. But FERC's speculation that the 2020 record theoretically could have included additional anomalies that no one bothered to identify is not substantial evidence of anything, much less sufficient to justify following the 2015 Order. The numerous *demonstrated* anomalies in the 2015 record were the crux of FERC's decision to use the middle 50% in 2015, 153 FERC ¶ 61,312 PP 42, 44 & n.83, so the lack of equivalent evidence in the 2020 Order record should have prompted FERC to reassess its reliance on the 2015 Order, not to assume without proof that the data were comparable.

# CONCLUSION

The Court should vacate the January 2022 Order and reinstate the 2020 Order.

Dated:  July 14, 2023

Respectfully submitted,

 /s/ Amy L. Hoff
Amy L. Hoff
Elizabeth B. Kohlhausen
Charles F. Caldwell
CBL ENERGY LAW PLLC
1800 West Loop South, Suite 1680
Houston, Texas  77027
(713) 357-6776
ahoff@cblenergylaw.com

*Counsel for Petitioners*
*Buckeye Partners, L.P.; Colonial*
*Pipeline Company; Energy Transfer LP;*
*Enterprise Products Partners, L.P.; and*
*Plains All American Pipeline, L.P.*

/s/ Miguel A. Estrada
Miguel A. Estrada
  *Counsel of Record*
Matthew S. Rozen
Aaron Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
MEstrada@gibsondunn.com

*Counsel for Petitioner*
*Liquid Energy Pipeline Association*

 /s/ Daniel J. Poynor
Daniel J. Poynor
Linda C. Bailey
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 429-6233
dpoynor@steptoe.com

*Counsel for Petitioner-Intervenor*
*Enbridge Inc.*

/s/ Hyland Hunt
Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave NW, Suite 900
Washington, D.C.  20001
(202) 868-6915
hhunt@deutschhunt.com

*Counsel for Petitioner-Intervenor*
*Energy Infrastructure Council*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of this Court's December 1, 2022 order because this brief contains 5,000 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14 point Times New Roman font.

3.  This brief complies with Circuit Rule 32(a)(2) because counsel for Designated Carriers consented to affixing Amy L. Hoff's signature to this document; counsel for Energy Infrastructure Council consented to affixing Hyland Hunt's signature to this document; and counsel for Enbridge Inc. consented to affixing Daniel Poynor's signature to this document.

Dated:  July 14, 2023                      Respectfully submitted,

/s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
MEstrada@gibsondunn.com

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on July 14, 2023, I electronically filed the foregoing document with the Clerk of this Court and served it on all counsel of record by using the CM/ECF system.

/s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
MEstrada@gibsondunn.com